Wayne VANDENBURG,
Plaintiff-Appellant-Cross-Appellee,

v.

NEWSWEEK, INC.,
Defendant-Appellee-Cross-Appellant.

No. 74–1318.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1975.

Francis C. Broaddus, Jr., Williams & Ellington, El Paso, Tex., for plaintiff-appellant-cross-appellee.

Richard Munzinger, Schuyler B. Marshall, El Paso, Tex., Stanley Godofsky, Leo P. Larkin, Jr., New York City, for defendant-appellee-cross-appellant.

Before RIVES, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

On this diversity libel suit's previous trip to our court, we affirmed denial of Newsweek's motion for summary judgment but cautioned "against attempting to glean from this decision any whisper of what the outcome should be on a motion for directed verdict, on the final verdict, or on a motion for judgment n. o. v." Vandenburg v. Newsweek, Inc., 441 F.2d 378, 380 (5th Cir.), cert. denied, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971). Unable to forecast then what our opinion would be, the parties are again before us on appeal from a judgment n. o. v. favoring Newsweek.

The alleged libel is contained in an article which appeared in Newsweek's July 15, 1968 issue. Entitled "The Angry Black Athlete," it dealt generally with the black power movement and its effect on college and university athletics. Vandenburg complains of two paragraphs:

> It is a mess that extends from Niagara to the University of California, from Michigan to the University of Texas at El Paso. Sometimes the racial issue is inflamed by a coach's get-tough policy. "I could give in to a lot of Negro demands," says one Southwestern track coach, "and keep my team intact. But someone has to hold the line against these people."
>
> At El Paso, track coach Wayne Vandenburg threatened to kick six athletes off the team if they joined the boycott of the New York Athletic Club indoor meet in February. The club was charged with discriminatory membership policies. Vandenburg won and the athletes competed. But two months later, after a talk with Harry Edwards, the same athletes refused to enter a meet at Brigham Young University in Utah because of Mormon doctrines about blacks. Vandenburg promptly dropped champion long-jumper Bob Beamon and five others from the squad.

After testimony, the case was submitted to the jury, who returned a $130,000 verdict for Vandenburg. Ten months later the trial court granted Newsweek's motion for judgment n. o. v., finding Vandenburg had failed to establish elements essential to his case. Vandenburg appeals; Newsweek asserts points on cross appeal, conditioned on our deciding Vandenburg's claims. Finding the judgment n. o. v. justified by Vandenburg's failure to establish actual malice, we affirm the trial court.

■ In a libel action brought by a public figure[1] or a public official, the plaintiff must satisfy the New York Times standard; that is, he "may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gertz v. Welch, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d

---

1. In our previous treatment of this case, it was decided that Vandenburg was a public figure and that the New York Times standard was applicable. Vandenburg v. Newsweek, Inc., 441 F.2d 378, 379 (5th Cir.), cert. denied, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971). Testimony at trial—from both Vandenburg and Axthelm—supports the decision that Vandenburg was a public figure, at least for a "limited range of issues." See Gertz v. Welch, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812 (1974).

789, 807 (1974). *See* Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (leading case). State-law definition of actual malice conforms, as it must, to this constitutionally-based privilege. El Paso Times, Inc. v. Trexler, 447 S.W.2d 403, 405 (Tex.1969).

The New York Times test represents recognition that the freedoms of press and speech are essential to that wide-open discussion of public issues deemed so important by our founders to the continued existence of our governmental system.[2] Further, the test is recognition "[t]hat erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'. . . ." (citations omitted). New York Times Co. v. Sullivan, *supra* at 271–272, 84 S.Ct. at 721. The public figure or public official generally has placed himself in a position inviting comment and has meaningful opportunity to rebut the alleged libel, so state interest in protecting the individual from damage to reputation is less compelling. Gertz v. Welch, *supra,* 418 U.S. at 343–345, 94 S.Ct. at 3009, 41 L.Ed.2d at 807–808. The balance is thus struck to limit the possibility of a self-censorship detrimental to the political and social system as a whole, despite the fact that deserving public persons may in some cases be unable to meet the stringent requirements of the New York Times test. *Id.* 418 U.S. at 343, 94 S.Ct. at 3008–3009, 41 L.Ed.2d at 807.

■ We assume arguendo that the statement at issue contained inaccuracies. As stated above, in order to establish actual malice under *Sullivan* standards, the plaintiff must show respondent had actual knowledge of falsity or reckless disregard of same. This is not a proposition that can be supported by a normative conclusion that the publisher should have known of the falsity of the statement. Rather, evidence—direct or circumstantial—of the publisher's subjective awareness is required. If plaintiff cannot show the publisher knew that the publication was false, he must show reckless disregard. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Negligent reporting methods are insufficient. New York Times Co. v. Sullivan, *supra,* 376 U.S. at 288, 84 S.Ct. 710. On the other hand, when the story is not "hot news," as is the case here, the investigation must be more thorough, and "actual malice may be inferred when the investigation . . . was grossly inadequate in the circumstances." Vandenburg v. Newsweek, Inc., *supra,* 441 F.2d at 380.

■ Remembering that evidence of actual malice must be clear and convincing, more than a preponderance, we proceed—as we should in First Amendment

2. " 'Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in opportunity *to discuss freely supposed* grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.' " New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720–721, 11 L.Ed.2d 686 (1964).

cases of this sort—to make an independent examination of the record.[3]

The New York Athletic Club (NYAC) meet, held in early 1968, was the focal point of black organizers' activities. Charging the club with discriminatory practices, the leaders of the protest urged Negro athletes to boycott the meet and organized picket lines. Only nine black athletes crossed the picket lines to participate in the NYAC meet; all six University of Texas at El Paso (UTEP) black athletes did so.[4] As his first piece of evidence tending to show actual malice, Vandenburg points to a *Sports Illustrated* article, authored by Axthelm close to the time of the NYAC meet, reporting Coach Vandenburg's explanation of his own role in the UTEP athletes' decision to participate as follows: "I asked each one if he wanted to come . . . and each one said yes. There was no pressure. I told them again tonight that they could back out and I'd never hold it against them." The *Sports Illustrated* article also stated that Bob Beamon, a UTEP athlete, had decided to participate in the meet so he could visit his family home in New York. As admitted by Axthelm himself, this story is contrary to the later *Newsweek* version reporting Vandenburg's threats to his team. Vandenburg makes much of this fact, along with the circumstances that "The Angry Black Athlete" was Axthelm's first cover story for *Newsweek* and that Axthelm intended—indeed solicited information—to cover one side of the black athlete's movement only, to show actual malice. Further, he points to Axthelm's failure to re-interview him or talk to the athletes involved, the NYAC officials or other UTEP officials before publishing his contrary version in *Newsweek*. As explanation, Axthelm proffers events at and subsequent to the NYAC meet and reports from sources he believes reliable. First, few blacks competed in the NYAC competition due to the boycott and picketing; all the UTEP athletes entered Madison Square Garden to compete. Also, it is fact that later some UTEP athletes refused to participate in a meet at Brigham Young University for racial reasons and as a result were no longer members of the UTEP track team. These facts could reasonably raise doubt about Vandenburg's earlier assertion, despite other press reports carrying Vandenburg's version. Secondly, Samuel Skinner and Harry Edwards provided information to Axthelm which led to publication of the *Newsweek* story. Skinner's deposition, introduced at trial, confirms Axthelm's uncontradicted testimony that Skinner was one source of the NYAC information. Harry Edwards testified that he had told Axthelm that the NYAC threat story had been confirmed by a UTEP track team member.

Vandenburg does not seriously dispute that Axthelm received the information as described. The issue, then, is whether Vandenburg had reason to think it false, reason to question the reliability of his sources or to investigate further given all the circumstances. Here, it is true, Axthelm's knowledge of Coach Vandenburg's previous statement about giving the UTEP track athletes freedom to choose whether to compete or not put Axthelm on notice that a more careful investigation was required, Curtis Publishing Co. v. Butts, *supra,* 388 U.S. at 157, 87 S.Ct. 1975, as did his own desire to produce a successful first cover story for *Newsweek, id.* at 158, 87 S.Ct. 1975. However, Axthelm had corroborative stories from sources he believed reliable containing facts not inherently improbable in light of later events.

■ The evidence does not show Axthelm's faith in his sources to be unreasonable. Samuel Skinner was sports di-

---

**3.** Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); New York Times Co. v. Sullivan, *supra,* 376 U.S. at 285–286, 84 S.Ct. 710.

**4.** Only five actually competed, the sixth being held out from participation due to his physical condition by Coach Vandenburg.

rector for KDIA radio in San Francisco and sports editor of the Sun Reporter, also of the San Francisco area. His news career spanned 12 years. He had worked as a stringer[5] for both *Sports Illustrated* and *Newsweek* previously. Vandenburg has failed to point to any fact that would have caused Axthelm seriously to doubt Skinner's reliability. While there is evidence that Skinner received some of his initial information from Harry Edwards, it does not appear that Axthelm knew that. On the contrary, Axthelm testified that Skinner asserted direct contact with Bob Beamon, a UTEP athlete. Skinner affirmed that he did indeed talk to Bob Beamon. Skinner's race is insufficient standing alone to indicate partisanship. Skinner did specialize in reporting about blacks in sports, but Vandenburg pointed to no instance in which Skinner's race affected the accuracy of his reporting of such sports. Vandenburg's main challenge to Edwards' reliability rests on Edwards' own involvement in the black athlete movement. Harry Edwards, then associate professor at San Jose State College and a former athlete, was a leader in organizing the NYAC boycott. His belief in the goals of the movement is unquestioned, and so he could be considered a biased source. On the other hand, he was a logical source of information since he and his staff were talking to black athletes around the country at that time. Axthelm testified that he had found Edwards' information on previous stories reliable. We regard that testimony as uncontradicted.[6] Aslo, Axthelm believed that Edwards had been in direct contact with UTEP athletes; Edwards confirmed that he had. The same story had been given Axthelm by Skinner.[7] Since both sources stated that they had talked

to UTEP athletes, there was no reason for Axthelm to think the information mere rumor. Finally, the June 1968 El Paso dispatch sent Axthelm is not inconsistent with the *Newsweek* story; it simply does not discuss the reason for the athletes' earlier participation in the NYAC meet. "While verification of the facts remains an important reporting standard, a reporter, without a 'high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution . . .." New York Times Co. v. Connor, 365 F.2d 567, 576 (5th Cir. 1966). Vandenburg has not shown that "high degree of awareness."

Much of what we have said applies also to the Brigham Young University meet incident, since Edwards and Skinner both were sources for Axthelm's version. In April 1968, several black athletes at UTEP decided to boycott the BYU meet because, inter alia, of their understanding of Mormon beliefs concerning Negroes. Officials at the University of Texas at El Paso, including Coach Vandenburg, responded with a statement that any athlete who did not participate in the BYU meet would be "voluntarily disassociated" from the track team. Axthelm reported that the athletes were "dropped" from the team. Putting aside the semantical difference—or lack thereof—Axthelm had ample reason to write what he did. Axthelm stated that Edwards and Skinner told him the athletes had been dropped from the team. Edwards testified, and Axthelm was aware, that his story had been verified by UTEP black athletes. Axthelm had additional backers; Anita Verschoth—a stringer especially used for

---

**5.** A stringer is a local reporter used by national news magazines and networks to gather local news information. He is used in lieu of the bureau reporters.

**6.** Vandenburg did attempt to show that Axthelm had inaccurately reported Edwards' information in other instances; however, in neither case is Edwards clearly shown to be the source of information for the story.

**7.** The facts in our case are distinguishable from Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), relied on by appellant. In *Butts,* the Saturday Evening Post knew its sole and one-time informant had been put on probation due to bad check charges but published without independent verification. Also, the author was not well versed on the subject of the article.

sports events and with whom Axthelm had worked earlier at *Sports Illustrated* —sent a dispatch to the writer containing a quote from Coach Vandenburg to the effect that he had suspended the athletes and that the suspension was final. Appellant did not establish Verschoth to be untrustworthy. Finally, Axthelm had received a dispatch from Dale Walker, the *Newsweek* stringer in El Paso, specifically containing the word "dropped." Walker's reliability went undamaged. Moreover, Walker was actually in El Paso. Further, we think it a reasonable interpretation of UTEP's official statement that the athletes were dropped from the track team as a result of their boycott.

One final portion of the story is challenged: the unattributed statement by "one Southwestern track coach" Axthelm used as an example of a "gettough" policy which exacerbated the racial issue. Vandenburg argues, as he must, that readers could only believe that the statement referred to him. That proposition is far from clear since the unattributed quotation is followed by a specific reference to Coach Vandenburg at UTEP; it seems at least as likely for a reader to decide that two different coaches were involved. The editing process stressed by appellant falls short of clear and convincing evidence of actual malice; indeed, it shows as well Axthelm's efforts to preserve the speaker's anonymity. In any case, Verschoth's dispatch contained similar sentiments attributed specifically to Coach Vandenburg.

■ *New York Times* dictates that appellant must have clear and convincing evidence of actual malice to win his suit. After examining the record, we agree with the trial judge that Vandenburg has failed to meet that standard.

Affirmed.

Political, social bias is not the indicator of potential falsehood that criminal activity is, especially when a record for reliability is shown. Here there was an independent source. Also, Axthelm was familiar with the subject matter of the article.