John LONG, Janice Long et al.,
Plaintiffs-Appellants,

v.

Larry ARCELL and Timothy F. Kriehn,
Individuals et al.,
Defendants-Appellees.

No. 78–2401.

United States Court of Appeals,
Fifth Circuit.

. June 13, 1980.

---

William Roberts Wilson, Jr., Gary L. Roberts, Pascagoula, Miss., for plaintiffs-appellants.

Mize, Thompson & Blass, John C. Ellis, Hollis C. Thompson, Jr., Gulfport, Miss., for defendants-appellees.

Before SIMPSON, HILL and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The plaintiffs in this diversity libel suit are the owners of Pas-Point Ambulance Service. On February 13, 1976 Pas-Point began operating in Jackson County, Mississippi. This suit is based on an article that appeared in the May 15, 1976 edition of the Biloxi Sun Herald entitled "Pas-Point Ambulance may have violated law." The article states that Pas-Point operated from February 13 to March 31 without having obtained a license from the Emergency Medical Services Division of the State Board of Health (EMSD).

The jury returned a verdict in favor of the plaintiffs and awarded them actual and punitive damages. The defendants' motion for judgment N.O.V. and, in the alternative, a new trial, was sustained and the plaintiffs appealed. We affirm.[1]

---

1. The district court's order does not state the grounds upon which the motion was sustained.

Since we conclude that the order must be affirmed on the actual malice issue, there is no

■ We assume for purposes of this appeal that the article was materially false. We also must assume that the plaintiffs were public figures when the article was written, for their attorney so stipulated at trial.[2] In order for the plaintiffs to recover damages, therefore, they were required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). The test of actual malice is not whether the defendant acted as a reasonable publisher would have acted under the circumstances. Rather, the inquiry focuses on the defendant's state of mind at the time of publication. *See Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1641, 60 L.Ed.2d 115, 124 (1979). There must be clear and convincing evidence that the defendant either knew the material was false or "*in fact* entertained serious doubts" as to its accuracy. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968) (emphasis added).

■ Mindful that the issue of actual malice is one of constitutional proportions, our review of the district court's order is not as limited as in most cases where a jury verdict has been set aside. Although we are not in a position to judge the credibility of witnesses, our duty is to make an independent examination of the evidence and determine whether there was a clear and convincing showing of actual malice. *Vandenberg v. Newsweek, Inc.*, 507 F.2d 1024, 1026–27 (5th Cir. 1975); *see Time, Inc. v. Pape*, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45, 50 (1971); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248, 250 (1967).

■ Pas-Point began operating in Jackson County on February 13. On February 18, Mike Shumaker, an EMSD field representative, inadvertently came across the Pas-Point operation. On that day, Shumaker gave Pas-Point oral authority to operate and also issued temporary permits for its ambulances. It was not until March 31 that a formal written license to operate was issued and the ambulance attendants temporarily certified by the EMSD.

Larry Arcell, co-author of the article, began his investigation into the Pas-Point matter after attending an April meeting of the Jackson County Board of Supervisors at which there was some discussion about Pas-Point's radio equipment. In early May, Arcell spoke with the two primary sources of information for the article, Doyle Bradshaw, EMSD' coordinator of field services,

---

need for us to remand the case for a clarification of the order.

**2.** Plaintiffs argue that under the Supreme Court's recent decisions in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) and *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), they are not public figures. These decisions were rendered after the trial. Plaintiffs contend that they relied on the Court of Appeals decisions in *Hutchinson* and *Wolston*, both of which were reversed by the Supreme Court. They request, therefore, that they be relieved of their stipulation and that we abide by the rule that an appellate court must apply the law in effect at the time it renders its decision.

This is not a case of "a mistake of law induced by the then existing state of the case law." *Logan Lumber Co. v. Commissioner of Internal Revenue*, 365 F.2d 846, 855 (5th Cir. 1966). First, *Hutchinson* and *Wolston* did not change the law; they merely applied the definition of public figure as it had been articulated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Second, it cannot be argued that these plaintiffs felt that the district court was bound by the Court of Appeals decisions in *Hutchinson* and *Wolston*; *Hutchinson* came out of the Seventh Circuit and *Wolston* out of the District of Columbia Circuit. Under such circumstances, the parties are bound by their stipulation.

and Shumaker. Among the many aspects of Pas-Point operations discussed was the question of licensing. From these conversations, Arcell learned that Pas-Point had begun operating on February 13 and that the EMSD first learned of their presence when Shumaker made his visit of February 18. It was during one of the conversations with Bradshaw that Arcell allegedly learned that Pas-Point did not receive a license until March 31. The week prior to publication, Arcell and his co-author, Robert Ellzey, had occasion to speak with Pas-Point's attorney, Robert Wilson, who disputed the accuracy of this information. Arcell and Ellzey decided that their information, having come from two EMSD employees, was correct, and went ahead with the article despite Wilson's protests.

At the trial, Shumaker testified about his discovery of Pas-Point's operation on February 18, and about his having given Pas-Point oral authority to operate. He also testified that he thought he had told Arcell that Pas-Point had been given authorization to operate. That conversation, however, occurred after the article was published. Shumaker did not testify that he told Arcell about the oral authorization during their May conversation.[3]

Bradshaw testified that he told Arcell in early May that Pas-Point had been licensed since February 18. Bradshaw also testified that he had a difficult time explaining to Arcell the difference between service licenses, vehicle permits, and attendant certifications.

Predictably, Arcell did not agree with Bradshaw's version of their conversation. He testified that when he wrote the story he had no doubts about its accuracy. Ellzey also testified that the article was believed to be accurate when written. Ellzey apparently had not had any contact with either Bradshaw or Shumaker.

The plaintiffs' attorney, Robert Wilson, questioned both reporters about the conver-sations he had with them prior to the publication date. The most relevant. of these conversations was one he had with Ellzey the day before publication. Wilson contended that he read Ellzey a letter from Shumaker which stated that Pas-Point was authorized to operate as of February 18. Ellzey remembered the conversation, but testified that he did not recall having been read the portion of the letter pertaining to authorization.

The plaintiffs' case rested almost entirely on the testimony of Bradshaw and Wilson.[4] Theirs was the only testimony relating directly to the defendant's state of mind. There was no documentary evidence which showed that the defendants knew their article was false or entertained serious doubts about its accuracy. In sum, the jury was left to decide the case based on the conflicting accounts of the conversations described above. If the applicable burden of proof had been a preponderance of the evidence, a jury verdict either way would have to stand. Similarly, if liability could be imposed on a clear and convincing showing of negligence, we would be hard pressed to disregard the jury's verdict. We repeat, however, that the plaintiff's burden was to prove actual malice by clear and convincing evidence. This record simply does not contain clear and convincing evidence that the defendants knew that their information was incorrect or had a "high degree of awareness of . . . [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

Although the Constitution neither condones nor encourages careless journalistic practices, the journalist who merely is careless may not be held liable for defaming a public figure. That is because the interests we must consider in libel cases are not only those of the defamed and the defamer. If they were, the former would prevail with a greater degree of frequency. In all libel suits between a public figure and a publish-

---

3. Almost all of Shumaker's testimony con-cerned the accuracy of the article.

4. Wilson did not actually get on the stand and testify. The trial judge allowed him to give his version of the conversations during his questioning of Arcell and Ellzey.

er the public intervenes as a matter of right, and its interest must be considered. Only by limiting liability to those situations in which the publisher has acted with actual malice do we fully protect the public's right to the benefits of a free and uncensored press.

AFFIRMED.