434 So.2d 687 (1983)
GULF PUBLISHING COMPANY, INC. and David Bean
v.
Webb LEE and Tommy Gollott.
No. 54030.
Supreme Court of Mississippi.
May 25, 1983.
Rehearing Denied July 13, 1983.
Mize, Thompson & Blass, John C. Ellis, W. Joel Blass, Gulfport, for appellants.
Joseph Sam Owen, Gulfport, for appellees.
Before BROOM, P.J., and BOWLING and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
Gulf Publishing Company, Inc., and David Bean appeal from a judgment rendered against them by the Circuit Court of the First Judicial District of Harrison County in favor of Webb Lee and Tommy Gollott for $100,000 each actual damages and $50,000 *688 each punitive damages, totaling $300,000.
The issue we address on this appeal is whether a newspaper publisher and one of its reporters are liable, under the decisions of the United States Supreme Court and this Court, for a factually inaccurate newspaper article concerning two elected officials. This question requires a consideration of the freedom of press clause of the First Amendment to the United States Constitution as heretofore interpreted.
We are persuaded the judgment cannot stand. We reverse and render.

FACTS
Gulf Publishing is a corporation with principal offices in Gulfport, and publishes a daily newspaper, The Daily Herald. In 1979 David Bean, a reporter, covered county affairs for this newspaper. Webb Lee was the incumbent circuit clerk, serving his fourth term, and Tommy Gollott was an elected member of the House of Representatives of the Mississippi Legislature from Harrison County. Both were candidates for re-election in the Democratic primary and general election held that year.[1]
Hue Snowden was an elected member of the Harrison County Board of Supervisors from District 4, completing his second term. In the west central part of District 4, and within Section 20, Township 6 South, Range 12 West, there is a public road known as "Mennonite Road," running east and west. In 1979 there was a public road, its south end beginning at Mennonite Road and extending approximately three-sixteenths of a mile north, known as "Russ Road." Mennonite Road and Russ Road were hard-surfaced. The public right-of-way did not terminate at the north end of the paved portion of Russ Road; an old trail, which once was a log road, extended north from Russ Road for another four to five hundred feet.
The right-of-way for Russ Road and the unimproved extension beyond its north end was encompassed in a right-of-way easement granted Harrison County by Norwood T. Latimer on June 5, 1972, 50 feet in width and extending north from Mennonite Road a distance of 1,309 feet.
Also, on October 25, 1972, Templeton Fowlkes, the owner of approximately 270 acres adjacent to and north of the Latimer realty, granted a right-of-way easement to Harrison County 50 feet in width, beginning at the north end of the Latimer easement and running north to the north line of Section 20.
Thus, in 1972, Harrison County acquired a road right-of-way 50 feet in width beginning at Mennonite Road on the south, and continuing north for almost a mile to the south section line of Section 17. The record in this case does not show whether Russ Road was a public road prior to 1972.
On February 3, 1978, Mr. Fowlkes executed a warranty deed unto Webb L. Lee and Thomas A. Gollott to the 270 acres, subject to "any and all recorded restrictive covenants, rights-of-way and easements." A title opinion rendered Messrs. Lee and Gollott specifically noted this 50-foot easement from the north to the south boundary of the property they were acquiring.
Subsequent to the acquisition of the property, Messrs. Lee and Gollott planned a rural subdivision of a part of the realty, consisting of lots ranging from slightly more than three acres to over eight acres in size. The subdivision was surveyed, platted, and titled "Big Hill Acres."
The road running north and south through the center of Big Hill Acres is not named on the plat, but was called "Big Hill Road" by Mr. Lee. At the north end of the subdivision, running west off "Big Hill Road," is another road, not named on the plat, but which was named by a Board of Supervisors' order as "Tootle Road." Tootle Road is approximately 1,000 feet in length, and terminates in a cul-de-sac at its west end at lots 3 and 4 in the subdivision. The distance in length of Big Hill Road from the south end of the subdivision to the *689 east terminus of Tootle Road is approximately 3,400 feet.[2]
Messrs. Lee and Gollott began improving the subdivision in 1978, clearing, draining, and preparing for roads. They contracted for and paid for the clearing, filling, and hard-surfacing of Big Hill Road through their subdivision to the intersection with Tootle Road, and also approximately 600 feet on the east end of Tootle Road. The paving was completed in May, 1979.
During the same period the county also placed an asphalt overlay on Russ Road connecting with the subdivision.
On June 1, 1979, Messrs. Lee and Gollott granted a road right-of-way easement to the county for Tootle Road, and on June 5, 1979, the Board entered an order accepting the road for public maintenance, and naming it "Tootle Road."
Mr. Snowden's daughter, a Mrs. Tootle, lived in a trailer, and subsequently in a home constructed on a lot on the south side of Tootle Road.
In 1979 there was an ongoing controversy between Mr. Snowden and some of his constituents who lived on or were required to travel Huston Ladnier Road located in District 4.[3] These constituents pressed the Board of Supervisors and Mr. Snowden to pave the road, and claimed they were being discriminated against by his failure to do so. Some of them appeared before the Board, and statements were made to the press.
The Daily Herald published two editions daily, the Gulf Coast Edition and the Metro Edition, which will be more fully discussed below. On June 20, 1979, the Metro Edition published an article written by Bean highlighting the Huston Ladnier Road controversy. The article related that 23 families who lived on the road, two representatives of which had appeared before the Board and on television, wondered if their "attitudes" would ever improve enough for Snowden to pave the road, and one woman who appeared on television said Snowden told her he would not pave the road until she apologized. The article reported Snowden as stating at a Board meeting he would not pave the road until the people living there "change their attitudes."
The article further stated Snowden denied this and gave as his reason for not paving the road that he had not been given the necessary easements. Continuing, the article stated some of the residents might file for a court order stopping paving of another road which had no houses on it.
The article stated that Snowden, during his current term expiring in 1979, had paved many miles of road in his district, most of which did not have as many people on them as Huston Ladnier Road, and most of the roads were only about 10 feet wide and some too narrow for cars to pass. Further, it stated Snowden had previously told a reporter, "It's all these people out here need," when asked why the roads were so narrow.
The next two paragraphs of the article, resulting in the lawsuit, are as follows:
He has also widened and paved Hill Top Road on which there are only a half dozen houses but which also provides access to a new subdivision being built by Circuit Clerk Webb Lee and State Rep. Tommy Gollott.
At the end of Hill Top Road, Snowden has paved the mile-long Tootle Road. *690 The only home on that road is a trailer occupied by Snowden's daughter.
The article continued with a quote from Snowden that he was going to pave the roads in his district one by one, with the ones on which he had right-of-way easements first, and he was not going to take roads by eminent domain.
The article concluded with a quote from Snowden that the families on Huston Ladnier Road were "mad, bitter and fighting me. As soon as the election is over, I'm hoping they'll come in and go along with me."[4]
The following day, on June 21, 1979, the same article appeared in the Gulf Coast Edition of the newspaper, with the two paragraphs above quoted in full deleted.
Also on that day the Metro Edition contained an article giving Mr. Lee's version of the story, in which he denied that the county had paved any portion of the road in the subdivision.[5]
On June 30, 1979, the newspaper published the following correction:
CORRECTION
The Metro editions of the The Daily Herald for Wednesday, June 20, 1979, and Thursday, June 21, 1979, erroneously alleged that Harrison County Supervisor Hue Snowden "had widened and paved Hill Top Road ... which provides access to a new subdivision being built by Circuit Clerk Webb Lee and State Rep. Tommy Gollotte," and that "Snowden has paved the mile-long Tootle Road. The only home on that road is a trailer occupied by Snowden's daughter."
The statements are incorrect. The roads are on private property owned by Lee and Gollott, and they are paying for the paving themselves.

The Daily Herald regrets the error and offers its sincere apologies to Supervisor Snowden, Circuit Clerk Lee and Rep. Gollott.
As a result of the June 20, 1979 article, Lee and Gollott sued Gulf Publishing and Bean for malicious libel.
The testimony of the witnesses as to the circumstances leading to the publication of these two paragraphs is in conflict.
Mr. Lee testified that he had two conversations with Bean on June 20. The first occurred at approximately 8:00 a.m. Lee stated that Bean told him he had "reliable information that Hue Snowden paved that road out there, those two roads out there, and he wanted to know if that was true or not." He said Bean first referred to the road as "Hilltop Road," and asked, "Do you know if Mr. Snowden paved Hilltop Road?" Lee testified he replied that he did not know anything about "Hilltop Road." Then, Bean stated it might be "Big Hill Road." According to Lee he then told Bean that Big Hill "is on my property and I know Mr. Snowden didn't pave that." Lee testified Bean asked about Tootle Road, and he was also informed "Mr. Snowden did not pave Hilltop Road  did not pave Tootle Road." Mr. Lee also testified that he offered to furnish Bean records of cancelled checks and invoices to prove he had paid for the paving, but that Bean had told him this was unnecessary.
Mr. Lee stated that later in the day he received a message at his office that Bean wanted to talk with him, and that he telephoned Bean at the newspaper office. There is some question about the time of this second conversation. According to Mr. Lee's testimony during trial, the conversation took place between 11:00 a.m. to 12:30 p.m. In a pretrial deposition, when questioned about the time of this second conversation, he replied:
Right, about one; sometime between twelve and one, and I called him back no later than, I would say, one-thirty. It might have been closer to one; I couldn't say for a fact.
In the second conversation Mr. Lee testified Bean asked him again, "Didn't you tell *691 me this morning that Mr. Snowden didn't have anything to do with paving Hilltop, Big Hill, Russ, or Tootle Road, any of those that you may own?" Mr. Lee then testified he reaffirmed to Bean that Mr. Snowden did not have anything to do with paving anything on "our private property." He then stated Bean told him that was funny, that Mr. Snowden had told him he (Snowden) did the paving.
According to Mr. Lee he then told Bean it was hard for him to believe Mr. Snowden would tell him he had done something that might make him liable to go to the penitentiary, and that he was going to call Mr. Snowden and "get it definitely straightened out."
He testified that when he hung up the phone he called Mr. Snowden.
There is no reference in the record, however, from further testimony of either Mr. Lee or Mr. Snowden, as to any conversation between the two of them following this second conversation between Mr. Lee and Bean.
According to Mr. Snowden the only conversation he had with Bean was on June 15, the Friday previous to the publication. He testified he and Bean joked with one another, and then Bean "started talking to me about the Huston Ladner Road and Big Hill and Tootle Road." Bean first asked Snowden how many houses were on Huston Ladner Road, and he replied "somewhere between 18 and 23." Bean then asked, "Why would you pave the Hilltop Road and not pave Huston Ladner Road?", and he replied, "David, you know damn well that I did not pave the Hilltop Road." He said Bean then asked him who did the paving and he responded, "the developers."[6]
Mr. Snowden testified that Tootle Road was included in the conversation, but "Hilltop Road was primarily what he asked me the question about." He further related that Bean had stated there were only five or six houses on Hilltop Road against twenty-something on Huston Ladner, and that he had then informed Bean the people on Huston Ladner Road would not give him easements.
Mr. Snowden said he informed Bean that his daughter lived in a house on Tootle Road, after having lived in a trailer while the house was being constructed.
Bean testified that he had interviewed people on the Huston Ladner Road, and was preparing a story about the controversy. Hearing something about the subdivision road, he went out and viewed the road through the subdivision, including Tootle Road. Following this, on June 15, he interviewed Mr. Snowden. Bean testified:
A. I wanted to ask Mr. Snowden if  I was preparing the story about the Huston Ladner Road and I had been contacted by people on that road and I had talked to several people on that road. They were dissatisfied; they couldn't get the road paved. There were twenty-some families living on it. The school bus had gone in ditches several times. They had come before the board previously to complain. They had called me to complain. A couple [of] people came to the office to see me. I felt it was a valid story.
Q. So what was your purpose in calling Mr. Snowden?
A. To  I was finding other roads that had been paved that weren't as well traveled as the Huston Ladner Road. It had been mentioned to me that Big Hill Road was paved by Mr. Snowden. I called 
Q. What about Tootle Road?
A. And Tootle Road. I called him to ask him did he indeed pave those roads and to ask him why he had not paved Huston Ladner Road.
* * * * * *
Q. Now, when you talked to Mr. Snowden, did Mr. Snowden tell you that *692 he paved Big Hill or Hilltop Road and Tootle Road?
A. Yes, he did.
According to Bean, Mr. Snowden also told him the only person living on Tootle Road was his daughter.
Bean testified he tried, without success, to reach Mr. Lee in his office on Friday following his conversation with Mr. Snowden, and that he did nothing further on the story over the weekend. On Monday and Tuesday of the following week (June 18-19) Bean was ill and out of the office.
Bean stated when he reached the office on Wednesday morning, June 20, he attempted to reach Mr. Lee at his home, and talked with someone, he did not know who, but failed to talk with Mr. Lee. He then tried to reach Mr. Lee at the circuit clerk's office, but was unable to talk to him. He left a message for Mr. Lee to return his call.
Bean testified he finished the story and turned it in to the editor's directory, and then left for lunch with his wife, also an employee of the newspaper.
According to Bean, it was in the afternoon when he returned from lunch, but he could not recall the time. A fellow reporter on another newspaper published by Gulf Publishing Company complimented him on the story, which she would have read in the freshly published edition as it came off the press.
Upon returning to his desk, Bean received a call from Mr. Lee. According to Bean, Mr. Lee then informed him that he and Tommy Gollott had paved the roads, that Mr. Snowden had not, that no county equipment had ever been used on the road, and that he had cancelled checks and invoices to substantiate that the county did not pay for the paving.
Immediately following this conversation, Bean testified he went to the assistant city editor Billy Ray Quave and told him, "I think I messed up," and then told Quave what Mr. Lee had said.
Bean testified Quave told him it was too late to do anything about the story that day, but something would be done the next day. The following day, in the Metro Edition, the newspaper published Mr. Lee's denial, supra. (See also appendix).
Bean testified he went to Mr. Lee's office on June 26 to examine records substantiating the statement that Messrs. Lee and Gollott had paid for the paving with their own funds, but Mr. Lee upon the advice of his attorney would not show him the bills.
As already stated, there were two editions published by The Daily Herald, the Gulf Coast Edition and the Metro Edition. The earlier Gulf Coast Edition was delivered to outlying areas served by the newspaper in Harrison and surrounding counties, and to the newsracks in the city. The Metro Edition was delivered to city homes.
The deadline to complete a story for publication in the Gulf Coast Edition was 10:30 a.m., and this edition went to press at noon.
The deadline to complete a story for publication in the Metro Edition was 11:30 a.m., and this edition went to press at 1:00-1:05 p.m.
In a matter of minutes after an edition went to press, newspapers would be printed, bundled onto a conveyor belt, and thence to trucks for delivery.
Assistant city editor Billy Ray Quave testified the editors of the newspaper checked the papers as soon as they came off the press for obvious errors. He recalled reading this story in the Metro Edition (the only edition in which it was published) as it came off the press. He surmised that approximately fifteen to twenty minutes later he left his desk to go for a cup of coffee or to the restroom, and as he was walking through the newsroom he ran into Bean, and heard a reporter comment to Bean that she had read and enjoyed his story, indicating to him the newspapers were then all over the building. Quave stated he returned to his desk after another lapse of time and resumed work. Bean's desk was a few feet from Quave's, and after Bean returned to his desk, Quave noticed him talking on the telephone. Quave stated that Bean talked on the telephone "a rather long *693 time," and after Bean hung up the phone, he remarked to Quave, "Billy, I think I messed up." Bean then told him he had just been talking to Webb Lee and that he and Tommy Gollott had paved the road leading into their property. The record is undisputed that Quave and Gollott were close personal friends of many years.
Quave testified as follows as to what he did following receipt of the information concerning Bean's phone conversation with Lee:
And at that time I glanced at the clock and it was too late to do anything about it because, well I imagine by that time the press had probably already stopped. Of course, as the papers are printed, they are not held until they're all printed but as they're printed, just as soon as they come off the press they're put on the trucks and they're taken away. The trucks are constantly going, and if  like I said, I did not make a note of the time; I had no idea I'd ever be sitting in the courtroom testifying, but it was late and it was too late to do anything about it, and when I knew about it, and at that time I was alone in the city desk, I'm certain there were editors in the room and they would go later, but there wasn't anything that they could have done because it was quite late.
The circuit judge overruled defendants' motion for a directed verdict, and following the jury verdict, overruled defendants' motion for judgment notwithstanding the verdict of the jury.

LAW
An examination of the language in the two paragraphs which formed the basis of this suit reveals:
(1) Snowden was charged with widening and paving a road which provided access to a subdivision owned by Messrs. Lee and Gollott;
(2) A half dozen houses were on this road;
(3) Snowden was also charged with paving a mile long "Tootle Road," which was at the end of "Hilltop Road," and Snowden's daughter was the only person living on Tootle Road.
These two paragraphs were inaccurate in the following respects:
(a) Snowden did not pave Tootle Road, and it is not even one-fifth of a mile in length;
(b) There is no such road as "Hilltop Road."
The paragraphs were accurate, however, in stating the county had widened and paved a road which provided access to this subdivision, because the county had indeed paved, overlaid, and widened Russ Road, leading from Mennonite Road to the subdivision. Also, several residences were located on Russ Road.
The only possible suggestion that the county had paved a road on private property was the statement, "Snowden has paved the mile long Tootle Road." Research into the minutes of the Board of Supervisors would have been required by any citizen interested in determining the whereabouts of Tootle Road, because it was not named on the subdivision plat. By the time any meaningful research could have been accomplished and information thereasto disseminated, the paper retracted the article insofar as there was any implication county funds were used on private property.
Thus, the only possible implication of any inappropriate use of public funds in these two paragraphs was the statement pertaining to Tootle Road. This was corrected, with apologies to Messrs. Lee and Gollott.
Neither of the plaintiffs was charged with any crime; neither was charged with dishonesty, nor, unless one attempted to "read between the lines," was any reflection made upon the morals or character of either.
The most which can be made of these paragraphs was that these public officials were recipients of favored treatment by Mr. Snowden, namely: he had widened and paved a road leading to their subdivision. This, of course, was true, except the road was incorrectly named. It did not charge *694 that county funds had been used on their private property.[7]
We are thus confronted with two questions: was the article defamatory as to the plaintiffs, and if so, do the defendants enjoy an immunity under the freedom of the press provisions of the United States and our State Constitutions?
We must first note that the claim of the article being defamatory as to the plaintiffs is dubious indeed.
In Manasco v. Walley, 216 Miss. 614, 63 So.2d 91 (1953), this Court had occasion to examine the ingredients of a defamation. Section 3175 of the Mississippi Code of 1942 (Miss. Code Ann. § 23-3-35 (1972)), provides that if any newspaper during an election campaign printed any story "reflecting upon the honesty or integrity or moral character of any candidate," it would upon written demand of the candidate be obligated to print verbatim the reply of the candidate. In Manasco v. Walley, a newspaper editorial charged that the candidate, while a member of the Legislature, had removed certain highways in the county from the priority list, and "they cannot be worked or paved now." Id. at 622, 63 So.2d at 92. The editorial further charged it was against the best interest of Greene County for the highways to be removed from the "priority" list. Id.
The candidate, the Honorable Ben Walley, demanded opportunity to reply, which was refused by the newspaper. Walley then sued, alleging that the editorial reflected upon his honesty and integrity and moral character. Walley secured a judgment and the newspaper appealed.
In reversing and rendering, this Court stated there was no obligation on the part of a newspaper to make amends for an unjust criticism by affording the candidate an opportunity to reply, and such obligation only existed when the publication "reflects upon the honesty or integrity or moral character of the candidate." Id. at 627, 63 So.2d at 95-96.
The opinion further states:
The word "reflect", as that word is used here, means to cast aspersion or reproach. "Integrity", as defined in Webster's Unabridged Dictionary, means moral soundness, freedom from corrupting influence or practice. "Honest" means fairness and straightforwardness of conduct, integrity, freedom from fraud. "Moral" means righteous or upright.
"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." ... In order to constitute defamation, the alleged libelous matter must assail "the integrity and moral character of the injured party." ...
"Words, in order to be defamatory per se, must be susceptible of but one meaning, and that an opprobrious one." ... And, in determining whether a publication is libelous, it must be considered as a whole, and its meaning must be ascertained from the language used, as commonly understood." ...
[D]efamatory words, to be libelous per se, must be of such a nature that the court can presume as a matter of law that they do tend to disgrace and degrade the person, or to hold him up to public hatred, contempt or ridicule, or to cause him to be shunned and avoided... .
The meaning of the editorial that we now have before us must be ascertained from the language used, as commonly understood; and it does not appear from the language used in the editorial that the writer intended to assail Representative Walley's integrity or moral character.
Id. at 627-28, 63 So.2d at 95 (citations omitted).
*695 It could be argued more reflection was cast upon Mr. Walley's character by the editorial than the article in this case. If Mr. Walley was a party to voting against the interest of the general public in his home county, the assumption could be entertained by some that he had acted for some personal or private gain. In the instant case, the most that can be argued is that a public official, who had the lawful right to select the location of public roads, had favored two other public officials by paving a road leading to their property, when there was a greater need for other roads to be paved.
In Natchez Times Publishing Co. v. Dunigan, 221 Miss. 320, 72 So.2d 681 (1954), this Court stated:
While the exact question has not been settled in this State, the general definition of libel per se was set out in Conroy v. Breland, 185 Miss. 787, 189 So. 814, 815, in these words: "At common law any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se...."
221 Miss. at 326, 72 So.2d at 684 (citations omitted).
Even if we give the plaintiffs the benefit of the doubt and assume the first hurdle has been crossed, the inquiry cannot end there. We still have the question of whether the defendants enjoy a freedom of press immunity. Here we must examine the intent of the defendants.
The United States Supreme Court, in construing the First Amendment, has given a virtually impermeable envelope of protection to publishers in libel suits brought by public figures.[8]
We are not faced with the liability of a newspaper for publishing erroneous or false information about a private person, in which an entirely different standard for the imposition of liability would rest.
Plaintiffs' declaration recognized and alleged they were public officials, damaged as such, and the article as to each plaintiff was "in his official capacity." The declaration charged the defendants with falsely, maliciously, and wickedly writing and publishing false, scandalous, defamatory and malicious writing and libel. In the course of the trial through and including the instructions to the jury, counsel for both sides recognized that the standard of liability in this case was as set forth in New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny.
In Reaves v. Foster, 200 So.2d 453 (Miss. 1967), this Court discussed the United States Supreme Court decisions involving articles defamatory of public officials until the date of that opinion.[9] In that opinion we stated:
The federal courts have pre-empted the field of libel and slander and have established that hatred, ill will, enmity, intent to harm or negligence are insufficient to establish malice toward those involved in discussions on public issues. That the defendants are protected under the First and Fourteenth Amendments of the United States Constitution, unless the plaintiff shows malice by proving that the defendant when he published the words  (1) either knew they were false, or (2) published them in reckless disregard of whether true or not.
We are required to follow the Supreme Court of the United States.
200 So.2d at 458-59.
In Reaves we reversed and rendered a judgment in favor of a plaintiff school principal *696 against the defendants for publishing pamphlets charging him with being "a puppet and a dummy," a "traitor to his race, a stooge, a stool pigeon," among other things.
Although a different question was before us, we had occasion to note in ABC Interstate Theatres, Inc. v. State, 325 So.2d 123 (Miss. 1976): "We are of the opinion, without deciding, that Article 3, Section 13 [of the Mississippi Constitution] by modern-day standards, appears to be more protective of the individual's right to freedom of speech than does the First Amendment since our constitution makes it worthy of religious veneration." 325 So.2d at 127.[10]
The burden of proving malice  knowledge of falsity or reckless disregard of the truth or falsity  is by clear and convincing evidence, not a preponderance of the evidence. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971); New York Times Company v. Sullivan, supra, at 285-86, 84 S.Ct. at 728.
Further, as to the "reckless disregard of the truth," the United States Supreme Court requires an examination of the mental state of the libeller. In St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court stated: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id. at 731, 88 S.Ct. at 1325 (emphasis added).
Finally, in determining the sufficiency of the evidence to pass constitutional muster, the appellate court must make an independent review of the evidence. As stated in New York Times v. Sullivan, supra: "We must `make an independent examination of the whole record,' ... so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. at 285, 84 S.Ct. at 728 (citation and footnote omitted). See also Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967).
These rules are summarized in Long v. Arcell, 618 F.2d 1145 (5th Cir.1980), a case in which the Court of Appeals for the Fifth Circuit had facts demonstrating a greater disregard for accuracy than shown in this case.
In Long v. Arcell, the Court stated:
In order for the plaintiffs to recover damages, therefore, they were required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). The test of actual malice is not whether the defendant acted as a reasonable publisher would have acted under the circumstances. Rather, the inquiry focuses on the defendant's state of mind at the time of publication. See Herbert v. Lando, 441 U.S. 153, 160, 99 S.Ct. 1635, 1641, 60 L.Ed.2d 115, 124 (1979). There must be clear and convincing evidence that the defendant either knew the material was false or "in fact entertained serious doubts" as to its accuracy. St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968) (emphasis added).

*697 Mindful that the issue of actual malice is one of constitutional proportions, our review of the district court's order is not as limited as in most cases where a jury verdict has been set aside. Although we are not in a position to judge the credibility of witnesses, our duty is to make an independent examination of the evidence and determine whether there was a clear and convincing showing of actual malice. Vandenberg v. Newsweek, Inc., 507 F.2d 1024, 1026-27 (5th Cir.1975); see Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45, 50 (1971); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248, 250 (1967).
618 F.2d at 1147.
Applying these burdens upon the plaintiffs to the facts of this case, we must hold there was a failure to prove malice as defined, either on the part of Bean or the newspaper, by clear and convincing evidence.
The evidence in this case shows that immediately after his afternoon conversation with Lee, Bean told his superior that he thought he had "messed up." This evidenced a state of mind contrary to any supposition that when he submitted the article for publication he either knew or seriously doubted that it was false. The proof also shows that following this conversation, the newspaper and Bean took every reasonable step to correct any error in the article, insofar as any implication against the plaintiffs was concerned.
In Long v. Arcell, supra, the court stated that even though it would be hard pressed to set aside the jury's verdict on a clear and convincing showing of negligence, that did not end the inquiry. In addition, there had to be clear and convincing evidence that the defendants knew, or "had a `high degree of awareness of ... [its] probable falsity.'" Id. at 1148 (citation omitted). The court then concluded:
Although the Constitution neither condones nor encourages careless journalistic practices, the journalist who merely is careless may not be held liable for defaming a public figure. That is because the interests we must consider in libel cases are not only those of the defamed and the defamer. If they were, the former would prevail with a greater degree of frequency. In all libel suits between a public figure and a publisher the public intervenes as a matter of right, and its interest must be considered. Only by limiting liability to those situations in which the publisher has acted with actual malice do we fully protect the public's right to the benefits of a free and uncensored press.
Id. at 1148-49.
The judgment of the lower court is reversed and judgment is rendered for the appellants.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, PRATHER and ROBERTSON, JJ., concur.
DAN M. LEE, J., dissents.

*698 APPENDIX A

Residents say supervisor won't pave their road due to their attitudes

DAVID BEAN

Herald Staff Writer
The 23 families on Huston Ladnier Road in Harrison County Beat 4 wonder if their "attitudes" will ever improve enough for Supervisor Hue Snowden to pave that dirt and gravel road.
Nearly two years ago, two women residing on the road appeared at a board meeting to ask that the road be paved. Snowden, who shortly before had heard the women criticize him on a television news program, said at the meeting the road would not be paved until people living there "change their attitudes."
One of the women said Snowden told her he will not pave the road until she apologizes for statements made on television. Snowden denies this and said last week he will pave the road when property owners give him necessary easements.
But one resident of the road says Snowden's talk of easements "is just a ploy. He'll grab the easements and still won't pave the road."
That man, who asked not to be identified, and some other families on the road may file for a court order stopping Snowden from continuing paving and widening CC Road, located about 5 miles from Huston Ladnier Road, off Mississippi 53. That road has no houses on it.
Snowden said last week he is paving CC Road at the request of Henry Ward, transportation chief of Harrison County schools. But Wednesday morning, Ward denied asking Snowden to pave that road. "We do not request them to pave roads," Ward said.
During the school year, three buses travel Huston Ladnier Road every day. At least twice, buses loaded with school children have gone off the wet, slippery road into a ditch.
"He's [Snowden] insisting that we go to his office and sign the easements in front of him, said Mrs. Betty Cuevas, who owns property on Huston Ladnier Road. "He's not there half the time. On all the other roads he's paving, he goes to the houses of the people living there for easements. Why can't he do that here?" she said.
Most of the land along the road belongs to International Paper Co. and Dantzler Lumber Co., and the county already has easements from those companies, Mrs. Cuevas said.
"Snowden told my son money wasn't the problem. He said nobody on this road is going to vote for him anyway so it doesn't make any difference to him," Mrs. Cuevas said.
"He blacktops roads that go nowhere. He even paved a little road in Beat 3. Why can't he pave this one? It's pure spite and a waste of the taxpayers money," she said.
Julius Cuevas said Snowden told him it would save the county money to pave the road. "If he paved it he would not have to send a grader all the way out here after every rain," Cuevas said.
Before the 1975 supervisor election, Cuevas said, Snowden paved Shaw Road, which is within one mile of Huston Ladnier Road. "I went to the county barn and asked him if he was going to pave our road also. He said yes, that it would be foolish of him to move his equipment without paving our road. So I got my family to vote for him and then he refused to pave the road," Cuevas said.
During his current term, which expires at the end of this year, Snowden has paved many miles of road in his district. Most do not have as many families or as much traffic as Huston Ladnier Road.
Most of the new roads are only about 10 feet wide and some of them are too narrow for cars to pass. "It's all these people out here need," Snowden told a reporter several months ago when asked about the narrow roads.
He has also widened and paved Hill Top Road on which there are only a half dozen houses but which also provides access to a new subdivision being built by Circuit Clerk Webb Lee and State Rep. Tommy Gollott.
At the end of Hill Top Road Snowden has paved the mile-long Tootle Road. The only home on that road is a trailer occupied by Snowden's daughter.
"I'm going to pave these roads one by one," Snowden said. "And I'm going to pave the ones I have the easements for first. I'm not going to go to court and take these roads on eminent domain."
Families on Huston Ladnier Road are "mad, bitter and fighting me. As soon as the election is over, I'm hoping they'll come in and go along with me," he said.

*699 APPENDIX B

Webb Lee says road was privately paved
Harrison County Circuit Clerk Webb Lee said Hill Top and Tootle Roads in Beat 4 were not paved by Supervisor Hue Snowden as reported in Wednesday's Metro edition of The Daily Herald.
Holcomb Asphalt Co. was contracted by Lee and Tommy Gollott to pave these roads, Lee said.
Hilltop Road gives access to a subdivision being built by Lee and State Rep. Tommy Gollott.
Snowden "absolutely hasn't put a piece of equipment on our property and never will as long as I have anything to do with it," Lee said.
In a conversation with a reporter last Thursday about road work in Beat 4, Snowden was asked if he had paved Hill Top and Tootle Roads.
Snowden replied that he had paved the roads. He also said that the only home on Tootle Road belongs to his daughter.
NOTES
[1] Lee was seeking re-election to his post, while Gollott was running for the Mississippi Senate.
[2] There is some ambiguity in the record as to the appropriate name of this north-south road through the subdivision. According to Mr. Lee, Russ Road became merged into Big Hill Road. Big Hill Road was also erroneously called "Hilltop Road."

The minutes of the Board of Supervisors pertaining to this particular portion of this road reveal the following:
(a) On May 7, 1979, the Board entered an order authorizing the extension of "Big Hill Road" to the north to be reduced in width from the regulation dimension of 20 feet to 18 feet;
(b) On June 5, 1979, the Board entered an order accepting this road for public maintenance and naming it "Russ Road."
For clarity in this opinion we will refer to the south end of this road where it joins Mennonite Road as "Russ Road," and the part through the subdivision as "Big Hill Road."
[3] This will also be referred to as Huston Ladner Road.
[4] The entire article is set forth as an appendix to this opinion.
[5] This June 21, 1979 article is also set forth as an appendix to this opinion.
[6] That even the county officials of Harrison County may have been confused about this road, however, is revealed in a report prepared by the county engineer in August, 1979, entitled "Roads Hue Snowden Paved". This report lists Big Hill Road, 4,337 feet (or .82 miles) long and 19 feet in width, as one of the roads. This obviously went considerably beyond "Russ Road," which was only slightly over 1,300 feet in length.
[7] Mr. Lee testified the article made aspersions on his honesty and integrity. This overlooks the fact that when Messrs. Lee and Gollott purchased their property the county owned a fifty-foot easement on which Big Hill Road was subsequently constructed, and had owned it for several years. The Harrison County Board of Supervisors had the legal authority to construct a road on this fifty-foot strip. If any reflection at all can be accurately read into the article, it is that Messrs. Lee and Gollott received better treatment than others.
[8] It is not to be concluded, however, that a public official has no recourse against newspapers when allegedly defamatory material is published concerning that official in a purely private matter having no relation to his public position.
[9] Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); and New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 684 (1964).
[10] Article 3, Section 13, begins: "The freedom of speech and of the press shall be held sacred; ..."