531 So.2d 811 (1988)
Sarah H. JOHNSON
v.
DELTA-DEMOCRAT PUBLISHING COMPANY, a corporation, and Ken Cazalas.
No. 57948.
Supreme Court of Mississippi.
October 5, 1988.
Fred C. DeLong, Jr., Roy D. Campbell, Jr., Campbell, DeLong, Hagwood, Wade & Stuart, Greenville, for appellant.
Luther T. Munford, Ross F. Bass, Jr., Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Philip Mansour, Sr., Mansour & Mansour, Stan Perkins, Greenville, John C. Henegan, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellee.
Before HAWKINS, P.J., and GRIFFIN and ZUCCARO, JJ.
GRIFFIN, Justice, for the Court:
This is a libel action brought against a newspaper, The Delta Democrat-Times (DD-T), and its editorial columnist, Ken Cazalas.
The appellant, Mrs. Sarah H. Johnson, the only black person of seven who comprise the City Council of Greenville, filed a complaint based on libel and actionable words, § 95-1-1, Miss. Code Ann. (1972), against The Delta Democrat-Times (DD-T) and its editor. She sought $450,000 in actual damages and $3.5 million in punitive damages. The basis of the complaint is a column by Mr. Cazalas: "A high brand of hypocrisy down at City Hall," which was published on November 24, 1985, in the editorial page column. The column criticizes the city council for holding closed meetings and refusing to release annexation records. The column is reprinted below:
Mercy me. Some City Council members have been sniping at Your Favorite Editor. I read it in the paper twice last week so it must be so.
One of them says she won't talk to reporters any more. She says she will maintain her verbal embargo "until your editor stops using the City Council as a whipping boy."
Another said "the editor is constantly on us unjustly; he's called us crooks, thieves and everything else."
I checked with my reporters just to be sure, and I'm happy to report that we will be able to keep putting out the paper every day without the gentle councilwoman's comments. We'll keep asking her questions, though, because we feel that maybe the folks who voted for her might be interested in what she's up to down there at City Hall. The truth is, when we quote council members, they're not doing us any favors; they're communicating with the public which pays their salary.
Heck, I don't blame them for not wanting to answer questions. They've got the jobs sewn up until the next election, after all, so why should they have to bother answering questions which might get sticky at times?
The comment that I had called them everything in the book was downright *812 silly. I've only called them a few things. I haven't even gotten to some of the good stuff. I haven't called them brigands, blackguards, pecksniffs, bedlamites, bandicoots, or bloodsuckers yet, and there's more where those came from.
I have never seen it fail. These politicians get themselves elected by promising everything to everybody and once they get entrenched in their jobs, holding tenaciously on in the public bloodstream like so many viruses, they suddenly feel above the corpus they are leeching.
One of these politicians went so far as to claim the City Council has nothing to hide, nor is it trying to pull the wool over anybody's eyes. That's great to hear, but tell me this: Why did they go behind closed doors 52 times during the first 10 months of 1985 to hold secret meetings? And tell me this: Why is that every time we seek a public document, even when such document is sitting on the counter in our reporter's view, the City Fathers force us into a labyrinthial ritual to get it? The reporter must write a formal letter, then wait 14 days for a reply, by which time the information usually is so old as to be useless. If they're not hiding anything, pray tell me: Why has the DD-T been forced to file several such formal, written requests each month  even when we want to pick up so benign a document as the City Council agenda packet?
Nothing to hide? Then why do they hide virtually everything they can? Nothing to hide? Poppycock!
A high brand of hypocrisy  or a low brand of chicanery  is being practiced down at City Hall these days. Its object may be to punish a newspaper, or its editor. But its effect is to punish the good people of Greenville. The people are being kept in the dark by a handful of politicians who prefer operating behind closed doors to operating in front of the people who elected them.
One of the councilmen was quoted in the paper last week as saying "I wish the newspaper would get with us instead of fighting us." All you've got to do, Mr. Councilman, is open your doors and let some sunshine in.
I called Mayor Bill Burnley Thursday afternoon and politely asked him four questions about the city's annexation attempts: What has the city paid in attorney's fees for its annexation case? What did the annexation exhibits cost the tax-payers? What did the feasibility studies cost the taxpayers? And, what did the expert witnesses cost the taxpayers?
The mayor wrote down the questions and said he would get back to me. Well, he got back to me all right, stonewalling me with a letter referring me to the city clerk who says, in effect, that the city has no idea how much of our money it has spent on its annexation attempts. They have been using tax dollars to pay lawyers, draftsmen, demographers, field engineers, statisticians and various and sundry other draymen for four years now. I am told they cannot give an accounting of themselves without an exhaustive and expensive research of the books.
In short, I did not get an answer to the four simple questions.
Open government? No secrets? Working for the public interest? Public servants? Balderdash. The city is run by obdurate orangutans, and they should be dispatched immediately back to the trees from whence they came.
Discovery was conducted simultaneously for this case and for another suit filed February 3, 1986. In the second suit the appellee, Delta Democrat-Times sued the City of Greenville and its council members for alleged willful and knowing violations of the Public Records Act of 1983, § 25-61-15, Miss. Code Ann. (Supp. 1986), based on a refusal to release records showing costs incurred in an annexation suit. Discovery included depositions, document production and interrogatories. Following discovery, defendants moved for summary judgment. The appellant filed a response, along with affidavits from herself and two others in the community construing the editorial column. The affiants said they read the subject column as well as previously *813 published articles specifically concerning the appellant.
In granting the summary judgment, the circuit court found there was no genuine issue of material fact, the column was one of opinion and commentary of publicly known facts and is privileged, that no defamatory remarks toward the appellant were made, and the actionable word statute, § 95-1-1, Miss. Code Ann. (1972), did not apply. This appeal followed.
The appellant's numerous assignments of error may be reduced to a single proposition: Did the trial court err in granting the appellee's motion for summary judgment?
To address this issue, we must determine if the appellant has established a cause of action for defamation. To create liability for defamation, there must be:
a) a false and defamatory statement concerning another; (reputation injuring);
b) an unprivileged publication to a third party;
c) fault amounting to at least negligence on the part of the publisher; and
d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Restatement (Second) of Torts, § 558 (1977).
In this case we are asked to review the editorial commentary in a state newspaper. In so doing, we reacknowledge the Fair Comment Doctrine; however, we do not ourselves profess to be bon vivants of editorial commentary.
To establish defamation in the case of a public official or figure, we look to federal standards of review which, due to the constitutional issues concerning free speech under the First Amendment, have preempted state and local standards.
In cases involving a public figure liability may not be imposed for otherwise actionable libel unless the statements were
made with knowledge of their falsity or in reckless disregard of whether they are true or false. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
The Sullivan standard has been adopted and repeatedly enforced by this Court. Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984); Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687, 695 (Miss. 1983); Reaves v. Foster, 200 So.2d 453, 458-59 (Miss. 1967).
In Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687, 696 (Miss. 1983), we cited New York Times v. Sullivan, supra, and said concerning defamation actions:
We must "make an independent examination of the whole record, ... so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. at 285, 84 S.Ct. at 728 (citations and footnote omitted).
434 So.2d 687, 696 (Miss. 1983).
We have held there are two restrictions on an action for defamation which must be strictly enforced. First, the words used must have clearly been directed toward the plaintiff and, second, the defamation must be clear and unmistakable from the words themselves and not the products of innuendo, speculation or conjecture. Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984).
The thrust of the appellant's libel claim is that Mr. Cazalas' statement that she "won't talk to reporters anymore" is false and implies she is up to something under-handed, immoral or illegal. The appellant also asserts that the appellees' use of collective statements in the column (such as "council members," "these politicians," "the City Fathers," "a handful of politicians," "Public Servants?," "obdurate orangutans," etc.) and plural pronouns ("they," "them," etc.) to refer to the city governing body as a whole are not reasonable. She claims that a reasonable inference is they refer to her individually and is in part a racial slur.
The appellant claims the references in the November 24, 1985, column are clearly directed toward her even though her name is not specifically cited, because the column refers to a quote she made to a DD-T reporter which was published in the same newspaper two days earlier. In the earlier article, entitled "Lease Difficulties Keep *814 North Terminal Vacant," the appellant refused to comment concerning an allegation of conflict of interest involving a lease by the Greenville Port Commission to a company presided over by the Port Commission Chairman. In response to the reporter's question, the appellant said:
When your editor stops using the City Council as his whipping boy, then I'll make comments to the Delta Democrat. Nothing personal... .
In the affidavits introduced by the appellant, the affiants state they read the November 24 column and understood the appellant to be the subject of specific insulting and defamatory references. Upon further examination of the affidavits, we find the affiants also state they had knowledge of facts apart from the subject column upon which to base their interpretation. One affiant states that his conclusions were based on a prior reading of the November 22 article where a specific quote from the appellant was presented. The affidavits, ironically, support a position contrary to that which the appellant has sought to establish. In short, they indicate an isolated reading of the November 24 column would not specifically direct the reader to the appellant individually.
In Reaves v. Foster, 200 So.2d 453 (Miss. 1967), we cited Edmonds v. Delta Democrat Pub. Co., 230 Miss. 583, 93 So.2d 171 (1957), observing a clear and succinct adoption of the Fair Comment Doctrine. Foster at 455. In quoting from Edmonds, supra, we said:
... When a person comes prominently forward in any way and becomes a public or quasi-public figure, he invites free expression of public opinion, including criticism. When such criticism is in the form of an opinion, relates to public assertions or acts rather than to the individual in his private affairs, is fair in the sense that the reader can understand the factual basis for the opinions containing the criticism, and the publication relates to a matter of public interest, then the occasion is conditionally privileged; and no action will lie for such publication no matter how severe the criticism or unfavorable the comments, if the privilege is not abused... . The immunity of the doctrine of fair comment applies not only to newspapers but to the public generally. Newell, Slander and Libel, 4th ed. p. 516. The interests of society require that immunity should be granted to the discussion of public affairs and that all acts and matters of a public nature may be freely discussed and published with fitting comments and strictures... . 230 Miss. at 590-591, 93 So.2d at 173.
Foster, at 456.
It has been recognized by this Court, and others that name calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for libel. Ollman v. Evans, 750 F.2d 970, 978 (D.C. Cir.1984); Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Curtis Publishing Co. v. Birdsong, 360 F.2d 344, 348 (5th Cir.1966). The United States Supreme Court has held editorial opinion is "entitled to the most exacting degree of First Amendment protection." FCC v. League of Women Voters, 468 U.S. 364, 375-76, 104 S.Ct. 3106, 3115, 82 L.Ed.2d 278, 289 (1984).
In Ferguson v. Watkins, supra, we held:
Opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false or defamatory facts as the basis for the opinion. 448 So.2d 271, 276 (Miss. 1984).
We noted in Ferguson that caustic commentary is simply not actionable libel. Ferguson at 276.
Former United States Supreme Court Justice Hugo Black said concerning our right to freedom of speech under the First Amendment:
... freedom of speech means that you shall not do something to people either for the views they have or the views they express or the words they speak or write. Interview Before the American Jewish Congress [April 14, 1962].
Justice Black wrote in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964):

*815 An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment.
We have upheld summary judgments dismissing libel claims on several occasions. Blake v. Gannett Co., 529 So.2d 595 (1988); Chatham v. Gulf Publishing Co., 502 So.2d 647, 650 (Miss. 1987); Fulton v. Mississippi Publishers Corp., 498 So.2d 1215, 1217 (Miss. 1986); Prescott v. Bay St. Louis Newspapers, Inc., 497 So.2d 77, 81 (Miss. 1986). In each case this Court compared "true" facts to the published facts and found no defamation. In a similar case, Lizak v. Associated Indem. Corp., 615 F. Supp. 17, 18 (S.D.Miss. 1985), the court granted summary judgment and rejected affidavits purporting to construe an alleged libelous article. The United States Supreme Court has held a public figure plaintiff may resist summary judgment only by showing clear and convincing evidence of constitutional malice in response to the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Upon examining the subject column we conclude it is one of opinion which is protected by the First Amendment and common law. The focus of the editorial is the City Council of Greenville, not the appellant. This is evident from the author's use of collective statements and plural pronouns. If the article is read all unto itself, nothing is stated which would defame the appellant individually. Readers ordinarily would expect the author's use of metaphorical language.
In Fulton, supra, we said:
In the procedural life of a defamation suit the court determines whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory. Manasco v. Walley, 216 Miss. 614, 630, 63 So.2d 91, 96 (1953); Brewer v. Memphis Publishing Co., Inc., 626 F.2d 1238, 1245 (5th Cir.1980); Restatement (Second), Torts § 614 (1977). If the court decides against the plaintiff on either of these questions, the case is ended.
498 So.2d at 1217.
The only evidence the appellant introduced to oppose the appellee's motion for summary judgment were the three affidavits. We have concluded these affidavits fail to support the appellant's proposition that the references made in the November 24 editorial column by Mr. Cazalas are directed toward her individually or are defamatory. No clear and convincing evidence of actual malice has been presented. We affirm the summary order below.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., dissents.