# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CT-00130-SCT

*BRYAN C. FAGAN, M.D.*

*v.*

*JUDY FAULKNER*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2022 |
| TRIAL JUDGE: | HON. JOHN R. WHITE |
| TRIAL COURT ATTORNEYS: | DENNIS HOWARD FARRIS, JR. |
| | MARK NOLAN HALBERT |
| | BRANDI ELIZABETH SOPER |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARK NOLAN HALBERT |
| | BRANDI ELIZABETH SOPER |
| ATTORNEY FOR APPELLEE: | DENNIS HOWARD FARRIS, JR. |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.  THE JUDGMENTS OF THE LEE COUNTY CIRCUIT COURT AND THE LEE COUNTY COUNTY COURT ARE REVERSED AND RENDERED - 11/14/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     In the instant case, the defendant surgeon, Dr. Bryan C. Fagan, called the plaintiff, Judy Faulkner, a "f*****g c**t."  Faulkner at the time worked as a surgical scheduler at the same surgical center.  He uttered the vulgarity in the presence of several operating room personnel, but Faulkner was not present.  Faulkner sued Fagan for defamation and intentional

infliction of emotional distress, alleging that the vulgarity constitutes an attack on her professional abilities, and, therefore, is slander *per se*.

¶2. After a bench trial, the Lee County County Court ruled in favor of Faulkner on the defamation count and in favor of Fagan on the intentional-infliction-of-emotional-distress claim. The emotional-distress claim is not before us here. Fagan appealed to the Lee County Circuit Court, and the Circuit Court affirmed. On appeal, the Court of Appeals reversed and rendered, holding that the county judge manifestly erred by finding the statement defamatory. *Fagan v. Faulkner*, No. 2022-CA-00130-COA, 2023 WL 2884538, at \*7 (¶ 28) (Miss. Ct. App. Apr. 11, 2023). We affirm the Court of Appeals' judgment, albeit on different grounds. We reverse the judgments of the Lee County Circuit and County Courts because they erred by denying Fagan's motion for a directed verdict.

## BACKGROUND

### 1. Factual History

¶3. The issues before the Court arose from a dispute between Faulkner and Fagan at North Mississippi Surgery Center in Tupelo, Mississippi. The two parties worked together for fourteen years. Fagan has an individual ownership interest in the center and has conducted orthopedic surgeries there since 2010. Faulkner works at the center as a clinical manager, a role she has held for approximately twenty years. As clinical manager, Faulkner is tasked with scheduling surgeries and assigning operating rooms for various surgeons affiliated with the center, including Fagan.

¶4.     The matter in question occurred on February 16, 2016, when Fagan had two surgeries scheduled, first a knee reconstruction surgery and then a shoulder surgery that typically involves the use of a piece of equipment called a "Spider."   Since that particular knee reconstruction surgery was estimated to take significantly longer than the shoulder surgery, and the shoulder surgery patient had already arrived, Fagan approached Faulkner, seeking to swap the surgeries for efficiency.  Faulkner informed Fagan that the surgeries could be swapped but that he could not use the Spider because it was scheduled for another surgeon at that time.  Fagan did not wish to perform the surgery without the Spider, and he became upset when he realized that he would not be able to switch the surgeries and have the use of it.  Fagan then repeatedly told Faulkner that she should be the one to inform the patient and the patient's family that they would have to wait until after the knee surgery.  Faulkner refused, and Fagan demanded that she call her boss and discuss the matter with him. Importantly, Faulkner did not put on any evidence at trial that the persons present in the operating room later had any knowledge of the above-described events leading up to the subject utterance.

¶5.     Evidently still upset with the situation, according to his own testimony, Fagan called Faulkner a "f*****g c**t" during a surgery later on in the day in the presence of four or five staff members.  No witnesses other than Fagan himself testified regarding events in the operating room, and no witness, including Fagan, offered any other testimony quoting any other statements made by him in the operating room.  Faulkner was not present to witness Fagan's outburst, but she inevitably heard from other staff members that Fagan had called her the vulgarity.  She never testified that she had been informed that Fagan questioned her

3

competence. Faulkner called no witnesses other than Fagan to testify about what Fagan had said in the operating room.

¶6. Faulkner testified at trial, but she did not testify that Fagan stated that she was not competent. Indeed, when asked, Faulkner clarified that she sought damages for Fagan's use of the vulgarity alone and for no other statements made by Fagan regarding her competence or otherwise. Accordingly, Faulkner's presentation of her case in the trial court and her testimony necessarily focused on Fagan's vulgarity, as both Faulkner's testimony and the complaint center around it.

## 2. *Procedural History*

¶7. On February 14, 2017, Faulkner sued Fagan, alleging defamation and intentional infliction of emotional distress. The Lee County County Court held a bench trial on July 21, 2021. Notably, Fagan provided the only testimony regarding the name calling; no other staff members who were present to witness the outburst testified.

¶8. The trial judge orally denied both Fagan's initial and renewed motions for directed verdict and gave the following findings of fact:

> During the course of one of the surgeries, the Court finds that Dr. Fagan, being upset with Ms. Faulkner and believing that she did not do a good job of scheduling surgeries, used some unfortunate language, which he's recognized as an unfortunate choice of words, hurtful words, and mean words.
>
> . . . .
>
> . . . The Court again, in the context in which the statement was made, I don't find that he was . . . just in a moment of exasperation just uttered out the words [FC].

4

The Court does find these were in the context of this case of and of the other things said during the relevant time frame a commentary on the job performance of Ms. Faulkner, and that they were, therefore, false.

¶9. The trial court ultimately ruled that, while Dr. Fagan's use of the hurtful words did not rise to the level of intentional infliction of emotional distress, they constituted slander *per se*. Thus, the trial court ruled in Faulkner's favor on that claim and awarded damages in the sum of $30,000.

¶10. While Faulkner did not appeal the ruling on her intentional-infliction-of-emotional-distress claim, Fagan appealed the county court's judgment on the defamation claim in the Lee County Circuit Court. In his order dated January 14, 2022, the circuit judge ruled that there was sufficient evidence supporting the verdict against Fagan and affirmed.

¶11. Fagan appealed, and we assigned the appeal to the Court of Appeals, which reversed and rendered the judgments of the Lee County Circuit and County Courts. *Fagan*, 2023 WL 2884538, at *7 (¶ 28). The Court of Appeals held that the trial court manifestly erred in its consideration of the evidence, reasoning that because the alleged defamatory words could not reasonably be considered as true or false, the statement was not actionable. *Id.* at *5 (¶ 19). Further, the Court of Appeals found that there was insufficient evidence connecting the explicit words to Faulkner's professional ability to support the trial court's finding of slander *per se*, so it reversed and rendered the court's decision, finding it had manifestly erred in its factual finding of defamation. *Id.* at *7 (¶ 28).

## STANDARD OF REVIEW

¶12. "A directed verdict exists so a defendant may challenge a case unsupported by sufficient evidence." *Forbes v. Gen. Motors Corp.*, 935 So. 2d 869, 878 (¶ 15) (Miss. 2006)

5

(quoting Miss. R. Civ. P. 50(a)). The Court's standard of review for a directed verdict is *de novo*. *Id.* at 873 (¶ 3) ("Th[e] Court conducts a de novo review of motions for directed verdict . . . ." (second alteration in original) (internal quotation mark omitted) (quoting *Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1055 (¶ 7) (Miss. 2003))). "If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom presents a question for the jury, the motion should not be granted." *Id.* (internal quotation mark omitted) (quoting *Bolden*, 854 So. 2d at 1055 (¶ 7)). However, the Court "has held that a trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." *Id.* (internal quotation mark omitted) (quoting *Bolden*, 854 So. 2d at 1055 (¶ 7)).

## DISCUSSION

¶13.    While we hold that the Court of Appeals was correct to reverse and render, we affirm it and reverse the judgment of the trial court only to hold that the trial court erred as a matter of law by denying Fagan's motions for directed verdict. Faulkner's claim fails at the threshold because name-calling is simply not actionable in Mississippi, and Faulkner's proof fell short of a *prima facie* case of defamation *per se*. While Fagan voiced complaints about Faulkner's job performance on the morning in question, the record contains no evidence that he made statements rising to the level required to prove slander *per se* by imputing to Faulkner "a want of integrity or capacity . . . in the conduct of [her] profession, trade or business . . . ." *Brothers v. Winstead*, 129 So. 3d 906, 928 (¶ 76) (Miss. 2014) (quoting *Speed v. Scott*, 787 So. 2d 626, 632 (Miss. 2001) (quoting *W.T. Farley, Inc. v. Bufkin*, 159

6

Miss. 350, 132 So. 86, 87 (1931))).  Therefore, we hold that the trial court erred as a matter of law by ruling otherwise.

### 1. Fagan's Name-Calling

¶14.    "Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him."  ***Barmada v. Pridjian***, 989 So. 2d 359, 362 (¶ 7) (Miss. 2008) (internal quotation marks omitted) (quoting ***Speed***, 787 So. 2d at 631.  Further, "defaming a person's character or reputation through the spoken word is actionable under the common law doctrine of slander."  ***Id.*** (citing ***Speed***, 787 So. 2d at 631).  A claim of slander is only viable if the plaintiff proves each of the following elements:

(a)    a false statement that has the capacity to injure the plaintiff's reputation;

(b)    an unprivileged publication, i.e., communication to a third party;

(c)    negligence or greater fault on the part of the publisher; and

(d)    "either actionability of statement irrespective of special harm or existence of special harm caused by publication."

***Speed***, 787 So. 2d at 631 (¶ 21) (quoting ***Franklin v. Thompson***, 722 So. 2d 688, 692 (Miss. 1998)).  When there is no special harm, an action for slander *per se* exists for "[w]ords imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business[.]" ***Id.*** at 632 (¶ 27) (internal quotation mark omitted) (quoting ***Bufkin***, 132 So. at 87).  Faulkner alleged the imputation of a want of her capacity to do her job.

¶15. "The threshold question is whether the statement made was defamatory, for if the statement was not defamatory, little else matters." *Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986) (citations omitted)). To determine whether a statement is actionable, it is important to distinguish "between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." Rodney A. Smolla, *Law of Defamation*, § 4:7 (2d ed. 1999). For the insulting statement to be considered defamatory, it must go "beyond mere swearing and insult and into the realm of factual misstatement[.]" *Id.* § 4:8. Further, "[t]he defamation must be clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture." *Johnson v. Delta-Democrat Publ'g Co.*, 531 So. 2d 811, 814 (Miss. 1988) (quoting *Ferguson*, 448 So. 2d at 275)).

¶16. We hold that, as a matter of law, the vulgarity Fagan employed against Faulkner did not impute to her a want of professional capacity; it did not concern her ability to do her job. To determine whether a statement is defamatory, "it must be considered as a whole, and its meaning must be ascertained from the language used, as commonly understood." *Manasco v. Walley*, 216 Miss. 614, 63 So. 2d 91, 95 (1953) (citing *Sweeney v. Caller-Times Publ'g Co.*, 41 F. Supp. 163 (S.D. Tex. 1941)). The statement before us is typically not used in the literal sense, referencing female anatomy, but rather is more commonly used to describe someone the speaker despises. The Cambridge Dictionary defines it as "an offensive word for a very unpleasant or stupid person."[1] The term has also been labeled "extremely

---

[1] *Cunt*, https://dictionary.cambridge.org/dictionary/english/cunt (last visited Apr. 17, 2024).

8

disparaging and offensive" and further defined as "a contemptuous term used to refer to a woman."[2] Thus, viewing Fagan's statement in a light most favorable to Faulkner, it can only be construed as declaring, in the most vulgar and offensive fashion, that he loathed, despised, or held Faulkner in contempt.

¶17. Faulkner relies on *McFadden v. United States Fidelity & Guaranty Co.*, 766 So. 2d 20 (Miss. 2000), but her reliance is misplaced. There, a physician sued an insurance company after an employee of the company referred to him as a "quack" and a "crackpot." *Id.* at 21(¶ 2) (internal quotation marks omitted). We held that the words were sufficient to support an allegation of defamation *per se*, but we did so based on the fact that the words quack and crackpot by their own definitions imputed a want of professional ability when applied to the doctor plaintiff. *Id.* at 24 (¶ 14). The vulgarity at issue here might be highly offensive but by itself says nothing about Faulkner's ability to do her job.

¶18. Accordingly, the statement at issue clearly falls under the name-calling category that we have distinguished from actionable defamatory statements. Insults, name-calling, and other such vulgar exclamations simply do not give rise to defamation actions. *See Ferguson*, 448 So. 2d at 276 ("stating that caustic commentary is simply not actionable libel"); *Johnson*, 531 So. 2d at 814 (recognizing that "name calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for libel" (citing *Ferguson*, 448 So. 2d at 276)). Indeed, as the trial judge described them, the words were unfortunate, hurtful, and mean, but they were not slanderous.

---

[2] *Cunt*, https://www.dictionary.com/browse/cunt (last visited Apr. 17, 2024).

9

¶19. While we hold that the name-calling at issue is not actionable, we also note that the trial judge and the Court of Appeals' dissent also erroneously relied on Fagan's intent behind making the statement to conclude that it referred to Faulkner's professional ability. *Fagan* 2023 WL 2884535, at *10 (¶ 47) (McCarty, J., dissenting). "[W]hen a statement is reasonably capable of several meanings, some of which would be defamatory and some would not, the burden is on the plaintiff to prove that it was reasonably and properly understood by the person or persons *to whom it was published* as having the defamatory meaning." *Taylor v. Standard Oil Co.*, 184 Miss. 392, 186 So. 294, 296 (1939) (emphasis added). Thus, regardless of Fagan's intent behind the statement, none of the staff members who witnessed it testified.

### 2. *The Dissent*

¶20. Having held that the vulgarity itself does not, as a matter of law, amount to defamation, we turn to address the Chief Justice's dissent. The dissent agrees that the two-word vulgarity itself does not suffice to support the verdict. Instead, the dissent contends that other words spoken by Fagan suffice to support the verdict against him. However, although the dissent writes of a supposed slanderous comment often, at no point does the dissent describe—much less quote—any slanderous language from the record. It is almost as though if the Chief Justice repeats the words slander and slanderous enough, his readers will forget that he identifies no actual slanderous language.

¶21. The Chief Justice does try, twice, to convince his readers that the record contains slanderous language, but as discussed below both attempts fail. First, he points to an

exchange between Fagan and Faulkner's counsel that occurred during counsel's cross-examination of Fagan in which, at most, Fagan expressed frustration with how Faulkner performed her job that morning. However, expressing frustration with one morning's job performance does not, as a matter of law, rise to the level of opprobrium necessary to prove slander. Second, the dissent attempts to turn a question from Faulkner's attorney into evidence, but as another matter of law, questions asked by attorneys are not evidence.

> ### a. *Fagan's potential criticism of Faulkner's job performance on the day in question fails, as a matter of law, to rise to the level of actionable defamation.*

¶22. The dissent asks more of the record than it can provide in quoting the following exchange from the trial:

> Q. But you stated that you were unhappy with the way she was performing her job *that day* in front of multiple people. Would that be accurate?
>
> A. Yes.
>
> Q. And I'm not dwelling so much on the use of that "C" word right now so much as I am that you were unsatisfied with her ability to do her job *that day* and you're mad about it?
>
> A. Correct.
>
> Q. And that opinion was voiced to several people as we've covered, correct?
>
> A. It was a statement that was said in the operating room in front of those people, yes.

(Emphasis added.) Taking the above-quoted testimony as true, as we must when considering whether the trial judge properly denied a motion for directed verdict, Fagan expressed dissatisfaction with Faulkner's job performance "that day." As a matter of law, however, in

11

order for Fagan's words to rise to the level of defamation *per se*, they must impute to Faulkner want of capacity in the conduct of her business. ***Brothers***, 129 So. 3d at 928 (¶ 76). Assuming for the sake of the argument that the dissent is correct and Fagan, along with the vulgarity, complained about Faulkner's performance of her job that morning, neither his complaint nor any reasonable inference that can be drawn from it amounts to a general disparagement of Faulkner's capacity to do her job scheduling surgeries.

¶23.    "Words, in order to be defamatory per se, must be susceptible of but one meaning, and that an opprobrious one." ***Gulf Publ'g Co., Inc. v. Lee***, 434 So. 2d 687, 694 (Miss. 1983) (internal quotation marks omitted) (quoting ***Manasco v. Walley***, 216 Miss. 614, 628, 63 So. 2d 91, 95 (1953)). The testimony upon which the entire dissent relies, quoted above, does not show any exact language used by Fagan in the operating room. Occurring as it does during the adverse examination of Fagan by Faulkner's attorney and taking it as true, all we can know about any statement made by Fagan in the operating room that day and in connection to Faulkner's work was that he was not happy with Faulkner's job performance that day. No more can be inferred that would constitute a criticism of Faulkner's job performance that was also published to the persons in the operating room.

¶24.    "[D]efamatory words, to be libelous per se, must be of such a nature that the court can presume as a matter of law that they do tend to disgrace and degrade the person, or to hold him up to public hatred, contempt or ridicule, or to cause him to be shunned and avoided . . . ." ***Id.*** at 695 (alterations in original) (quoting ***Manasco***, 63 So. 2d at 95). As noted above, the words must be susceptible of one meaning only, and that meaning must be

opprobrious. *Id.* at 694. In other words, in order to be actionable as defamation *per se* on the ground chosen by Faulkner, *i.e.*, a slander of her professional capacity, the words must convey outrageous disgrace or shame. *Opprobrious*, Random House Webster's Unabridged Dictionary (2d ed. 2001).

¶25.   As a matter of law, any statement by Fagan expressing dissatisfaction with Faulkner's job performance on one specific morning falls far short of the mark. In one of the earliest defamation *per se* opinions issued by our Supreme Court, ***Heralds of Liberty v. Rankin***, 130 Miss. 698, 94 So. 849 (1922), an insurance society sent the following notice, quoted in pertinent part, to its members:

> Dear Member: You are hereby notified to pay no further premiums in the Heralds of Liberty to our former collector, Laura B. Rankin, Gulfport, Miss., as it becomes necessary at this time for the future protection of our membership in Mississippi that a change in collectors be made, and we have this day canceled the appointment of Sister Rankin.

***Rankin***, 94 So. at 850 (internal quotation mark omitted). The ***Rankin*** Court held that the suggestion that Rankin's employment threatened the membership did not rise to the level of slander *per se*. ***Id.*** The Court held that, even with the language suggesting that Rankin's continued employment constituted some sort of threat to the membership,

> From this language there is nothing which tends to injure the reputation of the appellee, or expose her to public hatred, contempt, or ridicule, or degrade her in society, lessen her in public esteem, or lower her in the confidence of the community. Neither is there in this letter any language which imputes that she is unworthy of credit, and which naturally tends to injure her good standing and good name in the community or lower her in the confidence and respect of her neighbors.

13

*Id.* If, indeed, Fagan expressed unhappiness with how Faulkner scheduled the surgeries "that day," and, again, the record contains no evidence of what words he used to do so, an expression of unhappiness with a coworker's performance on one morning does not rise to the level of slander.

¶26.   *Rankin* can be contrasted not only with *McFadden*, discussed above, but also with *Holland v. Kennedy*, 548 So. 2d 982, 987 (Miss. 1989), in which the Court held that the plaintiff had made a *prima facie* showing of slander *per se*.  In *Holland*, the Court reversed a trial court's dismissal of a college professor's claim of slander made against the college's president.  *Id.* at 986.  The professor's complaint alleged that the college's president told the Mississippi Employment Security Commission that the professor was "a failure and unable to do his job satisfactorily" and "incompetent."  *Id.* (internal quotation mark omitted). The *Rankin* Court held that the alleged charges of incompetence could support a claim for defamation *per se*.  *Id.* at 986-987.  Here, reviewing as we are the denial of a motion for directed verdict, we are not looking at the allegations of a complaint but, rather, at the evidence Faulkner presented in her case-in-chief.  We are taking all such evidence favorable to her as true, and nowhere—including the snippet of cross-examination upon which the dissent depends—does Faulkner present evidence that Fagan accused her of being incompetent.  "[N]othing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it."  *Ferguson*, 448 So. 2d at 276.  An otherwise undefined expression of unhappiness with Faulkner's job performance on one morning does not even

14

amount to sharp criticism, much less defamation.  No authority or argument presented in the dissent or Faulkner's brief suggests otherwise.

### b.     *The dissent incorrectly characterizes a question asked by Faulkner's attorney as evidence.*

¶27.   Perhaps the dissent's most egregious attempt to create evidence where none exists is its use of Fagan's testimony that he did not remember making a statement; the statement exists nowhere in the entire record other than in the question of opposing counsel on cross-examination.  The exchange was as follows:

> Q.     Sure.  And did you say, *This place isn't run the right f\*\*\*king way.  It will never get better with c\*\*nts, like Judy, running the f\*\*\*king desk?*
>
> A.     I don't recall saying that statement.

Again, no witness testified that Fagan made the above-quoted statement.  Plaintiff failed to produce any evidence, whatsoever, that Fagan ever spoke the words quoted above.  Taking the evidence from the above-quoted exchanged in a light most favorable to the plaintiff, Fagan did not remember making a statement.  To take from it that he did make the statement is not taking evidence in a light favorable to the plaintiff, it is creating evidence out of the ether.   The failure to remember something is not evidence that the thing in question happened. ***Smith v. Tippah Elec. Power Ass'n***, 138 So. 3d 900, 904 (¶ 13) (Miss. 2014).

¶28.   The only place in the record the statement can be found is in within the question posed by Faulkner's attorney, and questions asked by lawyers are not evidence. ***May v. State***, 460 So. 2d 778, 783 (Miss. 1984).  In ***Lewis v. State***, 295 So. 3d 521 (Miss. Ct. App. 2019), the Court of Appeals applied the principle to hold that a defense attorney's questions regarding

the defendant's theory of the case could not support the giving of a properly refused jury instruction. *Id.* at 539-540 (¶¶ 58-60). Again applying *May*, the Court of Appeals wrote in *O'Kelly v. State*, 267 So. 3d 282, 296 (¶ 55) (Miss. Ct. App. 2018), that "questions . . . asked on cross-examination had no evidentiary value."

¶29. Even if the plaintiff had produced evidence that Fagan made the comment ascribed to him by counsel's question, it would not have been enough to survive a directed verdict absent evidence that someone heard it. In order to be sufficient to make a *prima facie* case for defamation, there must have also been proof that the statement was published to a third party. *Short v. Versiga*, 283 So. 3d 182, 185 (¶ 8) (Miss. 2019) (citing *Franklin*, 722 So. 2d at 692 (citing *Moon v. Condere Corp.*, 690 So. 2d 1191, 1195 (Miss. 1997)). It is beyond dispute that no witness testified that he or she heard Fagan make the specific statement about which he was asked above.

   c.  *Fagan never admitted slandering Faulkner in his answer to the complaint or anywhere else.*

¶30. The dissent in multiple instances writes that Fagan admitted making slanderous remarks about Faulkner. Fagan never admitted slandering Faulkner. The dissent cites no testimony or other evidence presented to the trial court during the trial that shows Fagan admitted slandering her. Even if relevant here, Fagan's answer to Faulkner's complaint relied upon by the dissent, *i.e.*, that he made comments regarding how Faulkner did her job and called her a name, Diss. Op. ¶ 52, as a matter of law falls far short of slander. At most, the answer admits that Fagan was critical, along the lines of the above-discussed cross-examination in which he potentially expressed frustration with how she performed her job

16

that morning, but "nothing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it." ***Ferguson***, 448 So. 2d at 276. Certainly, the admission from Fagan's answer, if relevant here at all, does not rise to the necessary level of opprobrium. ***Lee***, 434 So. 2d at 694.

> ### d. *Faulkner never testified that Fagan disparaged her professional ability, and all testimony as to the effects of Fagan's comment addresses his use of the two-word vulgarity and nothing more.*

¶31. Before leaving the dissent, it is worth noting that, despite the dissent's repeated and unsupported assumption that Fagan uttered slanderous words regarding Faulkner's professional abilities, Faulkner herself never testified that he did so. Indeed, she denied that she was suing him for any comment other than the two-word vulgarity. As noted above, Faulkner in her testimony and pleadings placed the vulgarity front and center in her case against Fagan.

> Q. Ms. Faulkner, at what time of the day did you hear from anybody that you were called a f**king c**t?
>
> A. Approximately 8:30 to 9:00.
>
> Q. And how many people verified that that had happened?

Clearly, the focus of the above-quoted evidence was the vulgarity itself and nothing else. Neither the question nor the answer refer to any other statement by Fagan concerning Faulkner's job performance or anything else. The record shows that it was the two-word vulgarity that became known throughout the testimony as "the statement." Later, when testifying about the effect that Fagan's words had, Faulkner testified, "I just don't deserve to be called something like this. Nobody would want to be called the most degrading name

17

there is." Not once during counsel's direct examination of Faulkner did she testify that Fagan had made any comments whatsoever about her ability to do her job or testify about how anything other than the vulgarity affected her.

¶32. Faulkner's testimony on cross-examination continues to make clear that she, at least as she saw it, sued Fagan over his use of the vulgarity.

> Q. . . . Alright, you heard that you were called a name by some of the staff, right?
>
> A. I did hear, yes.
>
> Q. Okay. And after that, then you went to several staff members to verify whether or not they had heard you being called that name, right?
>
> . . . .
>
> Q. Okay, so you went to each of these people to find out if he said that word, the "C" word?
>
> . . . .
>
> Q. He has made – has he called you the "C" word –
>
> A. No.
>
> Q. Since February of 2016?
>
> A. No, no not that word.

Again, on cross-examination, just as during direct, Faulkner did not once testify that Fagan said any of the things imputed to him by the dissent concerning her job performance. Her sole focus was the vulgarity. Again on cross-examination, she testified as follows:

> Q. What we're hear about today is him using the "C" word in February 2016, correct?

18

A.     Yes.

Q.     You're seeking damages for his use of the "C" word in 2016, right?

A.     Correct.

Q.     *You're not seeking damages for some other statement at any other time, right?*

A.     *No.*

(Emphasis added.)  Faulkner's testimony regarding Fagan's apology again shows that the only utterance at issue was the vulgarity itself.

Q.     Dr. Fagan has never disputed that he was wrong in using that "C" word, correct?

A.     He admitted that he did use the "C" word.

Q.     And that he was embarrassed by the use of that, correct?

A.     He did admit that he was embarrassed by using the "F" and "C" word.

Q.     And he told everyone he was wrong in using that "C" word, correct, whoever came to that meeting at the surgery center?

A.     The exact words, I don't know.  I do remember him saying that he was embarrassed.  He was ashamed and that he normally didn't use those types of words.

¶33.    Faulkner testified at later points about Fagan's statement, as his use of the vulgarity is called throughout the record, but what matters is that at no point did she express any complaint about any other statement made by Fagan about her.  She never testified that she had heard him make any of the purported comments upon which the dissent so heavily relies.  Faulkner's attorney again examined her on redirect.  During the course of that examination, he tried to move toward "the way the statements seem to have been targeted towards your

19

ability to do your job." During the course of the following exchange, no evidence of any other statement than the vulgarity was produced by the plaintiff. It is crystal clear that she sued him over calling her a f\*\*king c\*\*t.

¶34. Accordingly, the dissent misdirects with its lengthy discussion of the after effects of Fagan's use of the vulgarity by writing as though the testimony detailed the effects of a slanderous comment. All such testimony, as made clear in the record, details the effects of Fagan's use of the two-word vulgarity *and nothing more*. As discussed above and in the dissent, all justices agree that the two-word vulgarity by itself does not rise to the level of slander *per se*.

## CONCLUSION

¶35. Neither Faulkner nor the dissent identify any competent evidence from trial that shows the operating room personnel, to whom the allegedly defamatory vulgarity was published, would have understood it to defame Faulkner's professional abilities. As atrocious as Fagan's use of the vulgarity was, as to the audience to which it was published, it amounted to name-calling—not defamation. *Johnson* 531 So. 2d at 814. Even if we draw the favorable inference from Fagan's answers during cross-examination that he expressed unhappiness with Fagan's performance of her duties that day, such expressed dissatisfaction falls far short of expressing "a want of integrity or capacity . . . in the conduct of [her] profession, trade or business . . . ." *Brothers*, 129 So. 3d at 928 (¶ 76) (quoting *Speed*, 787 So. 2d at 632 (quoting *Bufkin*, 132 So. at 87)).

20

¶36.   The Lee County County Court erred as a matter of law by denying Fagan's motion for directed verdict, and the Lee County Circuit Court erred by affirming. Mississippi does not recognize actions in defamation for name-calling—even such an offensive one as the one used by Fagan. Contrary to Faulkner's contentions, the record does not give any context to evidence that the people who heard Fagan's vulgar statement would have understood it as a comment on Faulkner's job performance.

¶37.   **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENTS OF THE LEE COUNTY CIRCUIT COURT AND THE LEE COUNTY COUNTY COURT ARE REVERSED AND RENDERED.**

**MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. RANDOLPH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ., AND ISHEE, J.**

**RANDOLPH, CHIEF JUSTICE, DISSENTING:**

¶38.   The majority opines that name-calling is not actionable in Mississippi. Every Justice knowledgeable in the law would agree. However, the record reveals that much more than name-calling occurred when Dr. Fagan unleashed his anger in a vulgar outburst in the operating room. In rapid succession, Dr. Fagan's actions escalated from displeasure to aggressive hostility resulting in his slanderous per se statement.

**FACTS**

¶39.   One February morning in 2016, Judy Faulkner, a registered nurse who lived in Smithville, Mississippi (population 509), went to work at the North Mississippi Medical Center in Tupelo where she had toiled for thirty-four years. Tupelo is the heart of medical services in northeast Mississippi. As a registered nurse, she had earned the confidence of the

21

management and supervisors of the hospital and the North Mississippi Ambulatory Surgery Center.[3] She was the clinical coordinator for the surgical center and was charged with managing its operating rooms. Doctors' offices would call and request surgeries to be scheduled on particular days. Then, she would assign scheduled surgeries to specific operating rooms, allocate equipment for each surgery, assign the staff to work those surgeries, and coordinate and determine the proper time blocks for and order of each days' surgeries.

¶40. As any other day, Judy had ordered multiple surgeries for the surgical center. Dr. Fagan's office had requested two surgeries for that day—a shoulder surgery and a knee surgery. Dr. Rulewicz, a then-competitor of Dr. Fagan, had requested one—a shoulder surgery. There were issues confirming insurance for Dr. Fagan's shoulder patient, so Judy scheduled it after his knee surgery to provide more time for the insurance issues to be worked out.

¶41. At 12:30 p.m., parallel surgeries were scheduled to begin: Dr. Rulewicz doing the shoulder surgery and Dr. Fagan doing the knee surgery. At this time, the surgical center possessed only one Spider, a device used to secure a patient's arm during shoulder surgeries. Although Dr. Fagan preferred to use the Spider device in such procedures, its use is not required. An additional surgical tech would be added to operations to hold the patient's arm in place for doctors who do not use the Spider.

---

[3]The surgical center was jointly owned by the North Mississippi Medical Center and an LLC comprised of local doctors. Dr. Fagan was a member of the LLC.

¶42. Near 12:20 p.m., the series of events at the core of this case began. "Five to ten minutes before [the surgery]," Dr. Fagan approached Judy at the control desk and demanded to switch the order of his surgeries. Judy told him he could, "that was his choice," but the Spider would not be available because Dr. Rulewicz was scheduled to use it at the same time. After Dr. Fagan was told by Judy that he could not use the Spider, he abruptly left without a word. Within minutes, Dr. Fagan "came back in an angered tone of voice and asked [Judy] what *we* were going to do about it." Again, she told him it was his decision.

¶43. Dr. Fagan then continued the affray when he saw Judy walking down a hallway and stopped her at the doors. He confronted her, demanding, "what *we* were going to do about that case." Judy reminded him it was his choice. He wanted to know if she was going to talk to his patient.[4] She said "no." It was then that "he got right up in [her] face with his finger" and railed at her "in a much louder tone of voice" and berated her to get her supervisor (the surgical center's administrator) down there. Judy attempted to get the administrator immediately, but she was unsuccessful. It took about forty minutes for him to get back to her.

¶44. During this delay, Dr. Fagan's anger and emotions escalated. He repeatedly approached Judy in a hostile manner, and he kept getting "right in [her] face with his finger, yelling in a much louder tone of voice." Other employees "scattered" from the fray. That was the final conversation between Judy and Dr. Fagan that day. The coup de grace was soon to come but not in Judy's presence.

[4]At trial, she related, "the doctor is the one that goes and talks to the patient."

23

¶45.    Dr. Fagan went to the scheduled surgery.  In the operating room, in front of several nurses and surgical techs, including two new employees Judy had assigned to the operating room for the knee surgery, Dr. Fagan lashed out and angrily declared—in front of Judy's assembled staff—that Judy was unable to perform her job and referred to her as a "fucking cunt." Also in attendance was Dr. Heyer, a medical device representative. Judy was unaware of the hateful, denigrating, and untrue tirade that Dr. Fagan had unleashed until the next day.

¶46.    When Judy came to work the next morning, one of her superiors immediately asked her about Fagan's slanderous outburst.  This was the first she learned of Dr. Fagan's disparagement of her ability to perform her job and use of filthy words.  It did not take long for her to realize that "[e]verybody in the OR department, the front desk, the recovery room, everybody knew about it."  Once Judy confirmed the outburst with people who had been there, she reported it to a supervisor.  It was not until 1:30 that afternoon that Dr. Fagan called Judy and apologized to her without telling her what he had said.  Judy asked for an apology in front of her coworkers.  She wanted everyone in the surgical center that Dr. Fagan was wrong when he attacked her ability to perform her job.  Eventually, Judy received her public apology.  Dr. Fagan went on vacation and almost two months after he got back, the administration organized a meeting for an apology.  Whatever staff was present and available at the appointed time of gathering at the control desk witnessed it.

¶47.    Judy has never been able to move on from Dr. Fagan's attack on her ability to perform her job.  She testified that she is "not the person [she] used to be before that day.  It was – I did not deserve to be called something like that.  *I do my job and I do my job well.*"

(Emphasis added.) It was an attack on her hard-earned self-respect and self-confidence. "It made [her] doubt [her]self. . . . I was confident in what I did." "Even walking into my church on Sunday, I felt so low. I felt dirty. I felt like everybody there knew about it."

¶48. Longtime co-worker, Connie Robbins, R. N., testified that

[I]t was very upsetting to [Judy] to know that that had happened in the workplace, *that it happened in front of her employees that she deals with every day*, and then you've got to look at those employees every day and think about what happened in that room and how you were talked about.

(Emphasis added.)

¶49. April Hathcock, R. N., Judy's daughter, who had followed in her mother's footsteps, recalled the day her mother came home after she heard about Dr. Fagan's verbal attack. "She come home visibly upset to the point where she couldn't speak for a little bit about what was going on." "She was red-faced. She had been crying, and her eyes were swollen." "She—my mother—and this is God's honest truth—since that incident in 2016, has not been the same person, like, it has affected her emotionally. It has affected her, and it is very noticeable." "[M]y mother is a strong mother. . . . She has always been tough. She stands up for what is right. . . . And what I saw in my mother was not–I mean, it broke her, and I have never seen my mother like that." "And it all goes back to it, . . . you can say [Dr. Fagan's] name, you know, and she's – it's all over her."

¶50. In response to the question, "What was different about her? How . . . was she impacted?," Judy's husband, Teddy Faulkner, responded, "She was impacted very emotional, and she was – she was devastated." When asked how long did it last, he replied "it's still lasting." He also testified that she was worried about the effect it would have on her job:

25

"And I'm not so sure it didn't affect her a little bit on, you know, the prospect[] of being downgraded, may I say." Judy, a thirty-four-year employee, was worried that the statement saying she was unable to perform her job, made by part-owner Dr. Fagan would cause her to be demoted or to lose her job.

## ANALYSIS

¶51. Slander requires a false statement intentionally communicated to a third party that either (1) causes special harm, or (2) fits one of five slander per se categories. *Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001) (quoting *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998)). Dr. Fagan is liable for slander per se if he falsely stated about Judy "[w]ords imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business[.]" *W.T. Farley, Inc. v. Bufkin*, 159 Miss. 350, 132 So. 86, 87 (1931) (internal quotation mark omitted). You cannot lie and say a person is unable to perform their profession when they are competent. "Proof of the defamation itself is considered to establish the existence of some damages[.]" W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112 (5th ed.1984). This has long been the law in Mississippi. *See, e. g.*, *Bufkin*, 132 So. at 87; *Speed*, 787 So. 2d at 632; *Brothers v. Winstead*, 129 So. 3d 906 (Miss. 2014); *McFadden v. U.S. Fid. & Guar. Co.*, 766 So. 2d 20, 24 (Miss. Ct. App. 2000).

¶52. Viewed in the light most favorable to Judy, *as the standard of review requires*, the record contains ample evidence to satisfy each element of slander per se. Dr. Fagan twice admitted making a statement that Judy was unable to perform her job. First, Dr. Fagan

26

answered Judy's complaint as follows: "Defendant admits that he *made comments concerning how Plaintiff performed her job* and called her a name [('fucking cunt')]." (Emphasis added.) Rule 11(d) of the Mississippi Rules of Civil Procedure prescribes: "Averments in a pleading to which a responsive pleading is required . . . *are admitted* when not denied in the responsive pleading."

¶53.    Second, at trial, Dr. Fagan admitted making statements disparaging Judy's ability to perform her job:

> Q.    But you stated that you were unhappy with the way she was *performing her job* that day in front of multiple people. Would that be accurate?
>
> A.    Yes.
>
> Q.    And I'm not dwelling so much on the use of that [cunt] word right now so much as I am that you were unsatisfied *with her ability to do her job* that day and you're mad about it?
>
> A.    Correct.
>
> Q.    And *that opinion was voiced to several people* as we've covered, correct?
>
> A.    *It was a statement that was said in the operating room in front of those people, yes.*

(Emphasis added.)

¶54.    All witnesses testified that Judy was able to perform her job. Even Dr. Fagan begrudgingly admitted she "does an okay job." The testimony provides record evidence showing that, when Dr. Fagan stated Judy was unable to perform her job, that statement was false. A false statement was intentionally communicated by Dr. Fagan to third parties that Judy was unable to perform her job. All of the elements of slander per se were met.

27

¶55. The standard of review requires that an appellate court must grant all inferences favorable to Judy. Viewed in that light, the following points, derived directly from the record, require this Court to affirm the trial court's judgment of slander per se.

(1) A statement was made by Dr. Fagan disparaging Judy's job performance, which he admitted on the stand and in his answer to the complaint.

(2) Testimony supported that the statement was false.

(3) The statement disparaging Judy's job performance included the vulgarity "fucking cunt."

(4) In his findings of facts and conclusions of law, the trial judge explicitly stated that Judy's witnesses were "very credible." The judge was silent regarding Dr. Fagan's credibility, however.

(5) To the following question, "And did you say, *This place isn't run the right fucking way. It will never get better with cunts, like Judy, running the fucking desk?,*" Dr. Fagan responded, "*I do not recall* saying that statement. *I'm not saying it wasn't said*, but *I do not recall* saying that." (Second emphasis added.)

(6) Because of the slander, the other doctor in the room who witnessed it called Judy at 7:55 a.m. the following morning to apologize, the entire surgical center was talking about it the following day, Judy's superior approached her to talk about it as soon as he was aware of the incident, Dr. Fagan never repeated it again, and Judy has never felt the same at work since.

(7) April testified that "*statements* were made about her" mother—not that she was called a name, nor one singular statement.

Viewing these facts in the light most favorable to Judy, it is not only reasonable, but proper to affirm that the defendant's false statement was, in fact, slander per se. ***Canadian Nat'l/Ill. Cent. R.R. Co. v. Hall***, 953 So. 2d 1084, 1089 (Miss. 2007) ("[W]e *must* review all factual issues in the light most favorable to and supportive of the verdict." (emphasis added)).

28

¶56. At trial Judge James Moore carefully applied this Court's precedent and found slander per se. In the first appeal, Circuit Judge John White ably applied the correct standard of review and concluded:

> From a review of the record, taken in the light most favorable to Faulkner, and giving that party all favorable inferences that may be drawn from the evidence, this Court finds that the trial court applied the appropriate legal standard when it determined that there was sufficient evidence to base its verdict and judgment. The record reflects, and it is uncontested, that Fagan made disparaging (i.e., false) remarks about Faulkner, in the presence of others, and that were negligently made - or made with greater fault/intent. The only real dispute is whether the slander was actionable, or simply amounted to name-calling. The trial court heard testimony that the slanderous comments were made in relation to Faulkner's ability to perform her job. While Fagan did not unequivocally admit to the statement connecting the two, he also did not unequivocally deny its existence. As such, it was reasonable for the trial court to infer the intent of Fagan's statement as referencing Faulkner's abilities within her profession. Consequently, this Court finds that there existed sufficient evidence for the trial court to find that Fagan's statements were not simply vulgarities, or profanities, but were actionable under the law for slander, irrespective of special harm. Therefore, this Court finds there is substantial evidence in support of the verdict, of such quality and weight that reasonable and fair minded jurors ( or in this case, judges) in the exercise of impartial judgment, might have reached different conclusions, and affirmance is thereby required.

This Court must not be swayed by focusing only on the despicable vulgarity "fucking cunt." It was only part of what Dr. Fagan said in the operating room that day. Additionally, Judy *never* "alleg[ed] that the vulgarity constitute[d] an attack on her professional abilities," as the majority opines. Maj. Op. ¶ 1. A careful review of the record reveals extensive evidence that his outburst included more than just "fucking cunt."

¶57. Judy Faulkner did not deserve Dr. Fagan's untruthful tirade or to have her livelihood threatened. Our laws exist to protect against such damaging statements. Considering the

29

evidence in the light most favorable to Judy and following the law compels affirming the verdict of the trial court.

**KITCHENS AND KING, P.JJ., AND ISHEE, J., JOIN THIS OPINION.**